Charles E. HIGGINS, et al.,
Respondents,

v.

Kay LUFI, et al., Appellants.

No. C2–83–1164.

Court of Appeals of Minnesota.

July 17, 1984.

Review Denied Oct. 11, 1984.

Michael S. Polk, Hertogs, Fluegel, Sieben, Polk, Jones & Laverdiere, Hastings, for respondents.

Willard L. Converse, Peterson, Bell & Converse, St. Paul, for appellants.

Heard, considered and decided by PARKER, P.J., and FORSBERG and CRIPPEN, JJ.

## OPINION

PARKER, Judge.

This appeal brings into question the propriety of a trial court's sanction under Rule 37.02(2)(b), Minn.R.Civ.P., excluding expert

testimony because of a direct and willful failure on the part of appellants' trial attorney and the expert witness himself to obey the court's order that the expert be deposed. Appellants contend further that the trial court's refusal to grant a continuance of the trial and an additional adverse medical examination was an abuse of discretion constituting prejudicial error, that the court erred in allowing hearsay testimony as to a crucial issue, and that the verdict was excessive because of an improper final argument by respondents' attorney. We affirm.

## ISSUES

1. Did the trial court abuse its discretion in prohibiting an expert witness from testifying because of a bad faith, direct and willful refusal to obey the court's order that the witness be deposed?

2. Did the court abuse its discretion in refusing a continuance of the trial date and in denying a motion for a second adverse medical examination, when the second examining physician was not a witness and would not be available during the month in which the trial was set?

3. Did the court commit prejudicial error in allowing the injured child's mother to testify that no physician had told her that the child had any medical problems at the time of her birth?

4. Was the respondents' attorney's final argument so improper as to require a new trial when appellant's trial attorney did not object or request a curative instruction?

## FACTS

Because our decision turns mainly on the facts of this case, a detailed review is necessary. Charles and Diane Higgins have a seven-year-old daughter named Missy. When she was three years old, Missy fell into an open stairwell in the back yard of the Lufi's home. The Lufis were her babysitters. She sustained a massive skull fracture and subsequently experienced "lapse" seizures, which her physician diagnosed as post-traumatic epilepsy. Missy has perma-nent brain damage and will probably require daily medication to suppress the seizures for the rest of her life. She will require special education and has a 75 percent chance of developing major motor epilepsy as an adult.

The pretrial conference took place on January 28, 1983, and a trial date of May 17 was assigned. Missy had been examined by the respondents' expert, Dr. Gerald Slater, and was receiving follow-up treatment exclusively from him. She had also undergone an adverse medical examination in October 1982 by the defense expert, Dr. Robert Jeub. The parties had exchanged all medical reports. Both physicians had agreed that Missy's electroencephalograms (EEGs) were abnormal.

In early February 1983 Missy's kindergarten teacher notified Charles and Diane that Missy's performance in school was deteriorating. Dr. Slater then referred Missy to a psychologist for psychometric testing to determine the extent of her learning disabilities. Dr. Jacqueline Wiersma conducted the tests, which took several weeks to complete. Respondents' attorney told appellants about the testing on February 14. He also indicated on March 4 that he intended to call Dr. Wiersma as a witness at trial. The testing was completed on April 11 and revealed cognitive and emotional disorders consistent with trauma-induced brain damage. Respondents provided the raw test data to appellants on April 15.

On April 21 appellants moved in special term for a continuance and for an order compelling Missy to submit to another EEG. Appellants argued that a continuance was necessary because Dr. Robert Stoltz, the neurologist they wanted to interpret the psychometric results, was going to be out of town during the month of May. Appellants also argued that Missy's difficulties in school constituted new medical evidence and required another adverse medical examination. On April 27 the special term judge denied both motions and ordered the respondents to turn over Missy's most recent EEG and Dr. Wiersma's

evaluation within ten days; this was done on May 4.

On May 17, the first day of trial, appellants renewed their request for a continuance. The court denied it. Respondents moved to depose Dr. Jeub because immediately before trial they learned that he had changed his opinion about the cause of Missy's epilepsy. The court granted the motion and ordered the deposition to take place before Dr. Jeub was to testify.

On Monday, May 23, the last day of the trial, the court ordered, pursuant to Rule 37.02(2)(b), Minn.R.Civ.P., that Dr. Jeub would not be allowed to testify because the deposition had not taken place. Dr. Jeub was to have been the sole defense witness. The Lufis admitted negligence, so the only issues for trial were causation and damages. The jury returned a verdict for Missy Higgins in the amount of $750,000 and for her parents in the amount of $81,500.

## DISCUSSION

### I

The trial judge ordered a deposition of Dr. Jeub because he had changed his opinion about the cause of Missy's epilepsy. Appellants' new theory was that Missy had "intrauterine growth retardation syndrome" at birth and that this syndrome caused her seizures.

The record shows that court recessed early on Tuesday. Respondents' attorney says he attempted to schedule the deposition on Tuesday, Wednesday and Thursday with appellants' attorney and Dr. Jeub, but Dr. Jeub would not return his phone calls. (Because appellants have a different attorney on appeal, all references to "appellants' attorney" mean their attorney at trial.) Appellants' attorney said he told Dr. Jeub about the order on Tuesday, and he reportedly said that scheduling the deposition was "[the respondents'] problem." The respondents rested on Thursday, and the trial was continued until Monday because Dr. Jeub was not available to testify on Friday.

On Friday, respondents' attorney told appellants' attorney that he was going to subpoena Dr. Jeub. He sent a process server to Dr. Jeub's office at 2 p.m. Friday afternoon with a summons for a deposition at 9:30 p.m. Sunday evening. The process server found a note on the office door that said, "Office Closed Until Monday. Leave Messages With Answering Service." The process server tried to locate Dr. Jeub through the answering service and at his home, where a young woman said that Dr. Jeub "went up to the lake for the weekend." Numerous messages were left with the answering service, but no calls were returned.

On Sunday evening the process server returned to Dr. Jeub's home, where the same young woman replied that he was not home. The process server left the summons with the woman who answered the door.

When respondents' attorney called appellants' attorney to inform him that service had been accomplished, the response was, "How were you able to do that?" Dr. Jeub did not initially appear at the deposition. Appellants' attorney eventually called him and told him to appear after respondents' attorney threatened to move for a contempt citation. Dr. Jeub then came to the office but was instructed not to answer any questions.

On Monday morning appellants moved for a protective order on grounds of (1) insufficient notice of the deposition; (2) inconvenience, in that Dr. Jeub did not have his file on Missy Higgins with him and that it would have been an undue burden to obtain it; and (3) embarrassment, because Dr. Jeub had been drinking on Sunday evening and might not testify to the best of his ability.

Dr. Jeub was sworn and testified in chambers. On cross-examination the following exchange occurred:

Q: Doctor, as I understand, you were in the Twin City area on Friday afternoon and Friday evening, is that correct?

A: Well, I don't know—

MR. POLK: The record should reflect that Dr. Jeub is looking at Mr. Albers.
WITNESS: I want to know if it is relevant.
MR. ALBERS: I don't think it is.
THE COURT: * * * I think it is relevant and he may go ahead.
Q: Were you in town, Doctor, in the Twin City area on Friday afternoon and Friday evening?
A: Counsel, please, define Twin City area.
Q: Minneapolis, St. Paul, or surrounding suburbs.
A: What suburbs?
THE COURT: Let me ask you this: Where were you Friday afternoon and Friday evening?
WITNESS: I was in North Memorial Hospital. Village of Edina. I was in New Hope. I was up to Cross Lake, Minnesota, and I was in St. Paul.

Appellants' attorney never argued that he had tried to comply with the court's order. In fact, he objected to respondents' questions about attempting to set the deposition up, saying:

I don't think [the attempts] are relevant, your Honor, because I think that the facts speak for themselves, not the difficulties that he has. I think it is really immaterial as to what difficulties he had. It is the end result that we are concerned with and the end result is that a time was not—no time was arranged or the deposition would have been taken.

The court made specific findings of bad faith on the part of appellants' attorney and Dr. Jeub in scheduling the deposition, willful failure to cooperate and efforts to avoid service of process by Dr. Jeub, and prejudice to the plaintiffs. He then ordered, pursuant to Rule 37.02(2)(b), Minn.R. Civ.P., that Dr. Jeub not be allowed to testify and assessed appellants $500 in attorney's fees.

In their brief appellants make the following arguments:

(1) The trial court should not have ordered the deposition, so the fact that it didn't occur is an inappropriate basis for sanctioning appellants;

(2) They were entitled to the protective order because they lacked notice and because the deposition was scheduled at an unreasonable hour;

(3) The court erred in bypassing a less drastic sanction, e.g. convening a deposition on Monday morning; and

(4) The court's findings are not supported by the evidence.

None of these arguments are convincing. Rule 37.02(2)(b), Minn.R.Civ.P., provides:

If a party * * * fails to obey an order to provide or permit discovery, * * * the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

* &ast; &ast; &ast; &ast; &ast;

(b) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence.

█ The comments to the rule point out that these sanctions are available merely for *failure* to comply and do not require *refusal* to comply. In fact, the trial court could dismiss or render judgment against the disobedient party under Rule 37.-02(2)(c). *See Breza v. Schmitz*, 311 Minn. 236, 248 N.W.2d 921 (1976); *O'Neil v. Corrick*, 307 Minn. 497, 239 N.W.2d 230 (1976).

Appellants cite *Krech v. Erdman*, 305 Minn. 215, 233 N.W.2d 555 (1975), as explaining the standard by which trial courts are to mete out sanctions under Rule 37.02:

In cases where there is an honest mistake * * * and the harm can be undone, it may frequently occur that a continuance or some other remedy would be adequate but, where the violation is willful and the party guilty of the violation seeks to take advantage of it at a time when the harm cannot be undone, suppression of the evidence may very well be the proper and only available remedy.

*Id.* at 217, 233 N.W.2d at 557, quoting *Gebhard v. Niedzwiecki,* 265 Minn. 471, 477, 122 N.W.2d 110, 114–15 (1963).

■ We agree and think that the trial court applied the standard correctly. The court found a willful violation of its order, after a hearing where both attorneys and Dr. Jeub testified under oath. The appellants' and Dr. Jeub's utter lack of good faith is illustrated in the excerpt above. Appellants sought to take advantage of the violation by arguing that respondents had no right to further discovery because they had rested. Finally, the harm could not be undone. The trial had already been interrupted for a day and a half to accommodate Dr. Jeub's schedule. Appellants' willful refusal to cooperate had precipitated the crisis. The trial judge was faced with letting them get away with these tactics or imposing the only sanction left.

■ Attorneys have an ethical duty to cooperate in the discovery process and to obey court orders. A recent article highlights these duties and points out that delay, evasiveness and noncompliance may be the basis for disciplinary actions. *See* M. Hoover, Ethical Considerations in Discovery, *Minnesota Defense* 2–5 (Fall 1983).

■ Appellants' attorney on appeal makes the mistake of urging that the trial judge should have taken the less drastic measure of convening a deposition Monday morning, despite appellants' trial attorney's opposition! This argument is not simply disingenuous but is improper. Arguments raised for the first time on appeal will not be considered. The trial court's order excluding Dr. Jeub's testimony was fully justified; based on the facts and circumstances before him, he exercised sound discretion.

## II

Appellants argued at special term on April 21 and again on the first day of trial that a continuance was needed to allow for another EEG and to have the psychometric test data evaluated by Dr. Stoltz, their chosen expert, who would not be available from May 3 to May 27. Appellants did not argue at the hearing, as they do on appeal, that they wanted to do their own psychometric testing or that Missy's condition had not stabilized enough for trial.

This issue arose largely because the psychometric tests were not ordered until February 1983. The record shows that Missy's teacher precipitated the testing by writing to Missy's parents on February 7, stating that Missy was rapidly falling behind the other children. Respondents told appellants about the testing on February 14 and provided the raw data by April 15, more than a month before trial.

The special term judge denied appellants' motions but ordered respondents to provide Dr. Wiersma's evaluation of the data and Missy's most recent EEG within ten days. This material was furnished almost two weeks before trial. The first day of trial, appellants made the same arguments, adding nothing to the record that was before the special term judge. Not until their post-trial motions did they submit a letter from a Dr. Steven Morgan (dated April 21, 1983) saying that he could not interpret the test data because he was not familiar with some of the tests performed and because he did not observe Missy while she was being tested.

Appellants had represented to the court during the pretrial hearing and to respondents on two occasions that Dr. Stoltz would not be called as a witness. Missy had already undergone one adverse examination by Dr. Jeub who, like Dr. Stoltz, is a neurologist. Appellants offered no reason why Dr. Jeub could not review the EEG and the test data.

■ Rule 35.01, Minn.R.Civ.P., requires the party moving for an adverse medical examination to show affirmatively that the condition for which the examination is sought is "really and genuinely in controversy and that good cause exists for the particular examination in question." *Haynes v. Anderson,* 304 Minn. 185, 188, 232 N.W.2d 196, 199 (1975). The burden to show that the trial court abused its discretion in granting or denying an order for an adverse examination is an affirmative

showing of prejudice. *Hill v. Hietala*, 268 Minn. 296, 299, 128 N.W.2d 745, 748 (1964). The granting of a continuance is also within the discretion of the trial court and should not be reversed absent a showing of clear abuse of discretion. *Dunshee v. Douglas*, 255 N.W.2d 42, 45 (Minn.1977).

The facts of *Dunshee v. Douglas* generally support the proposition that trial courts may deny continuances for tactical maneuvering regarding expert testimony. In that case, the plaintiff underwent adverse medical examination two weeks before trial was scheduled to begin. He was also examined by his own expert, who was not disclosed as a witness because he was substituting for a disclosed expert who could not testify. After the defendants received this report, they moved for a continuance. The trial court denied it, and the Supreme Court affirmed.

In this case, respondents had three expert witnesses scheduled to testify, as well as Missy's teacher and her mother. The court was faced with a request for continuance of a case apparently ready for trial so that an additional, cumulative examination could be performed by another neurologist, who was not going to testify and who was not available. Neither the special term judge nor the trial judge abused his discretion. Their orders were more than justified based on the record before them at the time.

### III

When appellants' attorney cross-examined Dr. Slater, he offered Defendant's Exhibit 5, which is Missy's birth record from District Memorial Hospital in Forest Lake. He questioned Dr. Slater about intrauterine growth retardation syndrome and elicited the facts that Missy's physician had tentatively diagnosed the syndrome at her birth and that the syndrome could cause seizures. He asked Dr. Slater whether Diane Higgins had told him about the diagnosis and implied that she may not have been truthful in failing to tell Dr. Slater about the note in the birth record. Dr. Slater said that, in his opinion, Missy did not have

the syndrome but had merely been a small child at birth.

Later in the trial during Diane Higgins' testimony, the following exchange occurred on direct examination:

Q: Did the doctors indicate to you that there was any problem medically with Missy's condition after the time of her birth?

         \*      \*      \*      \*      \*      \*

THE WITNESS: No.

         \*      \*      \*      \*      \*      \*

Q: Did any physician, at the time Missy was born, ever indicate to you that there was something called intrauterine growth retardation?

A: No.

         \*      \*      \*      \*      \*      \*

Q: Did the doctors who attended to Missy and yourself ever indicate to you, at the time of birth, that there was any medical problem with Missy?

A: No.

Respondents' counsel then asked basically the same question about the first, second and third years of Missy's life, and Diane Higgins answered "no" to each one. Appellants objected to all of these questions on hearsay grounds, and the trial judge overruled them each time.

Appellants argue that these responses were inadmissible hearsay and constituted a medical opinion by the treating physicians that Missy did not have the syndrome. Respondents argue that the responses were not hearsay, and we agree.

First, the statements were not offered to prove the truth of the matter asserted. The hearsay rule does not apply when a relevant, out-of-court statement is introduced merely to prove the fact of its being made and not to prove the facts stated. *See Hauser v. Chicago, Milwaukee, St. Paul and Pacific Railroad Co.*, 346 N.W.2d 650, 652 (1984); *Beckman v. V.J.M. Enterprises, Inc.*, 269 N.W.2d 37, 39 (Minn.1978).

Second, appellants opened the door during Dr. Slater's cross-examination by placing Diane Higgins' credibility in issue, and respondents were entitled to rehabilitate her. The contention that her testimony constitutes a medical opinion was not raised at trial, and we will not consider it on appeal.

Determinations regarding hearsay evidence are largely within the discretion of the trial court. *Hase v. American Guarantee and Liability Ins. Co.*, 251 N.W.2d 638, 641 (Minn.1977). There was no abuse of discretion in allowing this testimony.

### IV

Appellants argue that they are entitled to a new trial on the issue of damages because respondents' attorney suggested a per diem formula for computing damages and used the so-called "golden rule" argument, suggesting that the jurors put themselves in the plaintiffs' position. Appellants did not object to this argument at trial, nor did they request curative instructions or raise these issues in their motion for a new trial.

Initially, we note that although per diem formulas are not looked upon with favor, they are not absolutely prohibited. *See Christy v. Saliterman*, 288 Minn. 144, 169, 179 N.W.2d 288, 304 (1970). We note that the trial court gave JIG 155, which placed the per diem argument in perspective. Respondents did not use a real golden rule argument; they merely asked the jury to use common sense in determining whether it was reasonable for Diane Higgins to stay home and care for Missy herself. But again, we will not consider issues raised for the first time on appeal.

### DECISION

The trial court did not abuse its discretion in excluding expert testimony under Rule 37.02(2)(b), Minn.R.Civ.P., in denying pretrial motions for a continuance and second adverse medical examination, or in allowing Diane Higgins to testify that no physician had told her about any medical problems after Missy's birth. Respondents' final argument was not so improper as to require a new trial when appellants failed to object or request a curative instruction.

Affirmed.