**STATE of Minnesota, Respondent,**

v.

**James W. WHITESIDE, Appellant.**

**No. C9–86–1497.**

Court of Appeals of Minnesota.

Feb. 3, 1987.

Review Denied March 18, 1987.

Hubert H. Humphrey, III, Atty. Gen., Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Anne E. Peek, Asst. Co. Atty., Minneapolis, for respondent.

C. Paul Jones, Public Defender, Mark F. Anderson, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by PARKER, P.J., and HUSPENI and FORSBERG, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

Appellant James Whiteside was convicted of third-degree criminal sexual conduct. His appeal is based on three alleged errors by the trial court: its refusal to limit the prosecution's impeachment use of Whiteside's prior conviction, its admission of hearsay evidence which allegedly lacked circumstantial guarantees of trustworthiness, and its denial of Whiteside's motion for a new trial after the victim's recantation of her trial testimony. We affirm.

## FACTS

L.F., age 15, lived in an apartment building with her nine-year-old brother and their mother; their father had died when L.F. was quite young. L.F.'s mother had remarried once, but the two-year marriage ended in a divorce in 1980. She dated several men after the divorce, one of whom physically abused her. According to her mother, L.F. resented these men because she did not want anyone to "try to be her father."

Whiteside was the mother's most recent boyfriend. They met in approximately January 1985, while he was in jail serving a sentence for a 1982 conviction for first-degree criminal sexual conduct. When released on parole in January 1986, Whiteside began staying overnight at their apartment. Although L.F. told her mother that she hated Whiteside, her mother continued to see him and the two were even considering marriage.

On January 25, 1986, L.F.'s mother went out for the evening while Whiteside and the two children watched television in the living room. Eventually, the children fell asleep. According to statements she later gave school counselors and police investigators, L.F. awoke to find Whiteside's hand inside her pants and his finger inside her vagina. She ran out of the apartment to the nearby apartment of her friend Michelle. When Michelle's mother, Carrie, answered the door, L.F. was crying hysterically. When asked repeatedly what was wrong, she responded only that she couldn't talk about it and that she wanted her mother. When Carrie asked if something had happened downstairs, however, L.F. answered "yes." Carrie expressed concern for L.F.'s brother, but L.F. said he was okay because Whiteside "wouldn't touch him."

Carrie went to L.F.'s apartment to make sure her brother was all right, and she met their mother in the hallway. Carrie told her that L.F. was crying hysterically and that something had happened. L.F.'s mother entered her own apartment and asked Whiteside what happened, to which he replied, "How should I know? Why don't you go ask her [L.F.]?" L.F.'s mother turned to Carrie and said, "See, he didn't do anything—he's been sleeping." L.F.'s mother then went up to Carrie's apartment to get L.F., with whom she appeared to be quite angry.

That night L.F. apparently told her mother what had happened, but her mother did not call the police. The next day L.F. told

Carrie that her mother would not believe her and would "take his [Whiteside's] side." Whiteside continued to frequent the apartment, prompting L.F. to spend much of her time at Carrie and Michelle's apartment in order to avoid him.

On February 10, 1986, L.F. told a counselor at her high school that Whiteside had sexually abused her. The counselor called the police, who came to the school to interview her and take a formal statement. L.F. did not want to tell the police anything; instead, she asked if she could write down what had happened. She wrote, "I woke up and he was down in my pants fingering me." She also said she had told her mother about the incident and her mother had told her it was "no big deal."

The next day, the police spoke with L.F.'s mother at her apartment. According to the testimony of Detective William Hanvik, the mother said that Whiteside had "only" tried to kiss her daughter, but she promised not to allow him back into her apartment if it was going to cause a problem. Hanvik told her that he believed Whiteside had gone beyond kissing her daughter and that he had touched her sexually. L.F.'s mother responded that everything had been cleared up between Whiteside and her daughter. When the officers asked her where they could find Whiteside, she told them it was none of their business. The police then removed L.F. from the apartment and placed her in a shelter home.

L.F.'s mother called Candace Lang, a child protection worker, to protest her daughter's removal. According to Lang, the mother said that L.F. was blowing a "little bitty thing" out of proportion because she didn't like Whiteside and that Whiteside "hadn't tried to rape her or anything." L.F.'s mother told Lang that when she found L.F. crying in Carrie's apartment, L.F. told her that Whiteside had "tried to kiss her and hug her and make love to her." The mother told Lang that she had confronted Whiteside and he admitted trying to kiss and fondle L.F., but said that he was sorry and would not do it

again. L.F.'s mother told Lang that she was tired of breaking up with her boyfriends just because L.F. did not like them and that she, Whiteside and L.F. had all agreed that Whiteside could remain as long as he was never in the apartment alone with L.F.

On February 12, 1986, Lang spoke to L.F. at the shelter home. Although reluctant to talk about the incident, L.F. again stated that she had awoken to find Whiteside's hand inside her pants and his finger inside her vagina. She also told Lang that her mother planned to continue seeing Whiteside on weekends and to have L.F. stay with friends on those occasions. The next day Lang again spoke to L.F.'s mother, who said she was not going to have anything more to do with Whiteside because "if he did it once, he'll do it again." L.F. was subsequently returned to her mother's home.

On February 24, 1986, Whiteside was arrested and charged with third-degree criminal sexual conduct, alleging sexual penetration of a victim under 16 years old and more than 48 months younger than the accused. Minn.Stat. § 609.344, subd. 1(b) (1984).

At a pretrial hearing the trial court granted the prosecution's request to permit impeachment use of Whiteside's 1982 first-degree criminal sexual conduct conviction in the event that Whiteside testified. The court denied the defense motion *in limine* that impeachment by prior conviction be limited to the fact that Whiteside had a 1982 felony conviction, without mentioning the crime by name.

Just before the trial commenced, the State was permitted to amend its complaint by adding a second count of third-degree criminal sexual conduct, alleging that L.F. was physically helpless at the time of the penetration. Minn.Stat. § 609.344, subd. 1(d) (1984).

At trial both L.F. and her mother were very reluctant witnesses. L.F. refused to state affirmatively that Whiteside had sexually abused her and repeatedly told the prosecutor to leave her alone, even after

the judge told her that she must answer his questions. She finally admitted that her prior statements to the police were true, however.

L.F.'s mother was quite uncooperative as a witness; she repeatedly testified that she didn't remember anything that had happened on the night of the incident, that her comments to Lang were being taken out of context, and that she would have said anything to get her daughter back.

The high school counselor, Lang and the investigating police officers testified at trial as corroborating witnesses. They were permitted to testify to what L.F. and her mother had told them despite the defendant's standing objection on the grounds of hearsay. Whiteside himself did not testify because his prior conviction could have been introduced to impeach him. At the conclusion of trial the jury found him guilty as charged on both counts.

Before Whiteside's sentencing, L.F. advised defense counsel that she had lied in her prior statements to the authorities and in her testimony and that Whiteside had not sexually assaulted her. Sentencing was postponed, and at a hearing on July 8 L.F. testified that she had fabricated the story about being sexually abused by Whiteside because she was angry with him that night and because she hated Whiteside and was afraid her mother would not get rid of him otherwise. L.F. said she continued to lie during the trial because she was afraid of getting into trouble if she changed her story.

L.F.'s mother testified that her daughter had told her as early as February that Whiteside didn't do anything. She said she hadn't told anyone of the recantation because no one asked. She also said she had refused to cooperate with the prosecutor because he was "being a jerk."

L.F., her mother and Whiteside all testified that L.F. had not been pressured into recanting. The State rebutted this claim by introducing records showing that L.F.'s mother and Whiteside had spoken on the phone nearly every day since his incarceration and that she had often visited him in jail and brought him money. At times, she had even brought L.F. along when she visited Whiteside in jail.

L.F.'s friend Michelle and Michelle's mother, Carrie, also testified for the State at the hearing. Michelle testified that before the trial, L.F.'s mother had once interrupted a telephone conversation between her and L.F. in order to tell Michelle that she and Carrie did not need to say anything at trial and that they should testify that they did not know anything.

Carrie testified to events that had occurred when she, Michelle, L.F. and L.F.'s mother were in a room together waiting to testify at trial. Carrie overheard L.F.'s mother tell L.F. that she did not have to say anything, that the county attorney's office was "the enemy," and that if L.F. did testify, "they would keep dragging her back to court." This upset Carrie, who told Michelle and L.F. that they should tell the court what they knew and told L.F.'s mother that it was wrong to tell L.F. that the prosecutor was the enemy. L.F. then told her mother that she still planned to tell the jury what she knew. This angered her mother, who began "slamming things around" the room. Ultimately, L.F.'s mother forbade L.F. from seeing or talking to Michelle anymore.

The court found that L.F.'s testimony at trial was not false and denied Whiteside's motion for a new trial. On July 30, 1986, Whiteside was sentenced on Count II to 81 months in prison, the presumptive sentence under the Minnesota Sentencing Guidelines. The first count was merged pursuant to Minn.Stat. § 609.04 (1984).

## ISSUES

1. Did the trial court abuse its discretion by ruling that Whiteside could be impeached by a prior conviction for first-degree criminal sexual conduct?

2. Did the trial court act within its discretion in admitting the hearsay testimony of social worker Candace Lang regarding her conversations with L.F.'s mother?

3. Did the trial court err in denying Whiteside's motion for a new trial in light of L.F.'s subsequent recantation of her testimony?

## DISCUSSION

### I

█ In reviewing evidentiary determinations, this court will reverse only upon a showing of a clear abuse of discretion. *State v. Brouillette*, 286 N.W.2d 702, 707 (Minn.1979).

In Minnesota, the admissibility of prior convictions for impeachment purposes is governed by Minn.R.Evid. 609(a), which provides:

For the purposes of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect * * *.

In determining whether the probative value of admitting the evidence outweighs its prejudicial value, five factors are to be considered:

(1) the impeachment value of the prior crime;

(2) the date of the conviction and the defendant's subsequent history;

(3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach);

(4) the importance of defendant's testimony; and

(5) the centrality of the credibility issue.

*State v. Jones*, 271 N.W.2d 534, 538 (Minn. 1978).

There was impeachment value in Whiteside's prior conviction, because impeachment by any prior crime aids the jury by allowing it to see the whole person and thus to judge better the truth of his testimony. As our supreme court has stated,

[t]he object of a trial is not solely to surround an accused with legal safeguards but also to discover the truth. What a person is often determines whether he should be believed. When a defendant voluntarily testifies in a criminal case, he asks the jury to accept his word. No sufficient reason appears why the jury should not be informed what sort of person is asking them to take his word. In transactions of everyday life this is probably the first thing that they would wish to know. * * * Lack of trustworthiness may be evinced by his abiding and repeated contempt for laws which he is legally and morally bound to obey * * * though the violations are not concerned solely with crimes involving "dishonesty and false statement."

*Brouillette*, 286 N.W.2d at 707 (quoting *State v. Duke*, 100 N.H. 292, 293, 123 A.2d 745, 746 (1956)).

█ Whiteside asserts that any impeachment value of his prior crime was diminished because the conviction was from 1982. However, Whiteside had been released from prison on parole just two weeks before the date of his misconduct. Under similar circumstances, the supreme court stated that "[t]he prior conviction of aggravated rape was four years old but defendant was in prison in the interim between the two offenses so it would seem that the offense had not lost any relevance by the passage of time." *State v. Bettin*, 295 N.W.2d 542, 546 (Minn.1980); *see also State v. Edwards*, 380 N.W.2d 503, 508 (Minn.Ct.App.1986) (evidence of 12–year-old conviction admitted where charged offenses occurred only months after defendant's release from prison).

█ Whiteside claims that because his prior conviction was for a similar crime, it would unduly influence the jury. In several Minnesota cases, however, such evidence nevertheless has been admitted. *See State v. Reinke*, 343 N.W.2d 660 (Minn.1984) (prior conviction for fourth-degree criminal

sexual conduct admissible when the offense charged was first-degree criminal sexual conduct); *Bettin*, 295 N.W.2d 542 (prior conviction for rape admissible when offense charged was third-degree criminal sexual conduct); *Brouillette*, 286 N.W.2d 702 (prior conviction for third-degree criminal sexual conduct admissible when offense charged was fourth-degree criminal sexual conduct); *State v. Heidelberger*, 353 N.W.2d 582 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. Sept. 12, 1984) (prior convictions for first-degree criminal sexual conduct admissible when offense charged was third-degree intrafamilial sexual abuse).

Moreover, as the supreme court pointed out in *Brouillette*,

> a cautionary instruction would presumably have been given which directs the jury to consider the prior conviction only as it relates to defendant's credibility. *See*, CRIM JIG 3.12. Such an instruction adequately protects defendant against the possibility that the jury would convict him on the basis of his character rather than his guilt.

*Brouillette*, 286 N.W.2d at 708; *see also Heidelberger*, 353 N.W.2d at 590 ("A cautionary instruction would have adequately protected appellant in the present case, had he testified at trial"). The trial court could have given a similar instruction here.

Whiteside argues that it was important for him to testify because of the "inescapable" adverse inference that results when a defendant does not take the stand. Although Whiteside's testimony may have helped to establish his fabrication defense, cross-examination made the nature of that defense clear to the jury. *See Heidelberger*, 353 N.W.2d at 590 ("The defense of fabrication was presented to the jury through the cross-examination of the victim").

Finally, Whiteside asserts that his prior conviction would not have aided the jury in assessing his credibility because the conviction had minimal impeachment value. However, in a similar case this court stated:

Generally, if the defendant's credibility is the central issue in the case—that is, if the issue for the jury narrows to a choice between defendant's credibility and that of one other person—then a greater case can be made for admitting the impeachment evidence because the need for the evidence is greater. * * * In view of appellant's claim that the victim fabricated her story * * *, the jury would have had to decide whether to believe appellant's testimony or the complainant's. Thus, there was a strong need for evidence of the prior convictions for impeachment purposes.

*Heidelberger*, 353 N.W.2d at 590–91 (citation omitted).

■ Whiteside contends that even if his prior conviction were admissible for impeachment purposes, the court should have granted his *in limine* motion to refer to the prior crime only as an unspecified felony. He cites no relevant authority for this proposition, and we find that the court did not abuse its discretion in denying this motion.

## II

■ Whiteside's second claim of error involves the trial court's admission of hearsay testimony. Over Whiteside's continuing objection, the court allowed Lang to testify that L.F.'s mother told her that Whiteside had admitted fondling L.F. Whiteside's statement to L.F.'s mother is not hearsay, because it was an admission by a party-opponent. Minn.R.Evid. 801(d)(2). The mother's statement to Lang, however, was hearsay which did not fit under any of the enumerated exceptions to the rule against hearsay.

"Determinations regarding hearsay evidence are largely within the discretion of the trial court." *Higgins v. Lufi*, 353 N.W.2d 150, 157 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. Oct. 11, 1984). Here the trial court apparently admitted the statement under Minn.R.Evid. 803(24), which provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. \* \* \*

Minnesota case law makes it clear that the key issue in determining whether hearsay testimony is admissible under Rule 803(24) is the hearsay's trustworthiness. *See State v. Ortlepp,* 363 N.W.2d 39, 44 (Minn.1985); *State v. Soukup,* 376 N.W.2d 498, 501 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Dec. 30, 1985). There were several indications that the statements were trustworthy. First, L.F.'s mother's statements to Lang were against her interest, as she was clearly hostile to the prosecution and Lang and supportive of Whiteside. The statements were consistent with the testimony of other witnesses such as the school counselor and police investigator. In addition, Lang took notes during the conversation, and like the witnesses in *Soukup,* she had no reason to fabricate. Furthermore, L.F.'s mother testified at trial and was subject to cross-examination. In light of these circumstances, we find that the trial court acted well within its discretion in admitting Lang's hearsay testimony.

## III

■ Whiteside also claims the trial court erred in denying his motion for a new trial in light of L.F.'s post-trial recantation of her testimony. As a general rule, "a court should not grant a new trial on the basis of recanted trial testimony unless the court is reasonably certain that the recantation is genuine." *State v. Walker,* 358 N.W.2d 660, 661 (Minn.1984); *State v. Risken,* 331 N.W.2d 489, 490 (Minn.1983). Furthermore, "[c]ourts have traditionally looked with disfavor on motions for a new trial founded on alleged recantations unless there are extraordinary and unusual circumstances." *State v. Hill,* 312 Minn. 514, 523, 253 N.W.2d 378, 384 (1977); *see also State v. Caldwell,* 322 N.W.2d 574, 585 n. 7 (1982) ("Courts tend to view recanted testimony with suspicion because of the possibility that it was obtained through coercion").

The trial court concluded that L.F.'s recantation was of doubtful character, based on several factors. The court felt that L.F.'s actions were all consistent with her original claim and that her testimony at trial "had the ring of truth to it." The court also noted that on June 29, 1986, just one day before her recantation, L.F. told the public defender's investigator that she had not lied at trial.

The trial court's well-reasoned order also made clear that the court perceived a substantial possibility that the recantation had been coerced:

The victim's mother \* \* \* admitted regular contacts with defendant while he was in jail \* \* \*. She has an ongoing and close relationship with the defendant. Notwithstanding her adamant efforts to prevent the prosecution of this matter during the course of her interviews with the County Attorney or his staff before the trial commenced, she did not at any time state that her daughter had changed her statement or proposed testimony about the allegations in the complaint.

Because the trial court was in the best position to judge the credibility of the various parties and to sense the possibility of coercion, we find no error in denial of Whiteside's motion for a new trial.

## DECISION

The trial court did not abuse its discretion by refusing to limit the State's im-

peachment use of the defendant's prior conviction or in admitting hearsay testimony and did not err in denying the defendant's motion for a new trial in light of the victim's recantation.

Affirmed.