STATE of Minnesota, Respondent,

v.

Kevin Patrick PLANTIN, Appellant.

No. A03–258.

Court of Appeals of Minnesota.

July 13, 2004.

Mark D. Nyvold, Attorney at Law, St. Paul, MN, for appellant.

Mike Hatch, Attorney General, St. Paul, MN, and Amy Klobuchar, Hennepin County Attorney, David C. Brown, Assistant County Attorney, Minneapolis, MN, for respondent.

Considered and decided by PETERSON, Presiding Judge; TOUSSAINT, Chief Judge; and ANDERSON, Judge.

## OPINION

G. BARRY ANDERSON, Judge.

Appellant was charged with and tried for attempted murder, first-degree burglary, kidnapping, and second-degree assault, but the district court declared a mistrial. Appellant was retried in December 2002. The jury convicted appellant on all counts, and the district court sentenced appellant. This appeal follows.

## FACTS

*The undisputed facts of the April 17, 2002, incident*

Bernadette Patin (victim) and appellant Kevin Plantin began dating in 1998. On April 17, 2002, a witness saw the front door to the victim's house swing open and heard someone inside the house yell. The front door then slammed shut. Later that day, Jennifer Cross, the victim's daughter, and David Soderstrom, the victim's brother, went to the victim's house. At the house, Cross looked through a window and saw the victim's purse on the floor with the contents strewn about. After calling the police, Cross entered the victim's home through a window. Soderstrom, who also entered the house, saw blood splatters in the house.

Cross and Soderstrom went to look in the garage but could not get in because it was locked. While they were outside the garage, they could hear the victim saying, "Help me" from inside the garage. The victim eventually unlocked the door to the garage and came out. She was bleeding and had duct tape around her wrists and ankles, and collapsed after she came out of the garage. She told Cross, "Help me, I can't breathe." The victim told Soderstrom that Plantin had "tried to kill" her.

Emergency personnel arrived at the victim's house and found the unconscious victim lying on the ground near the garage.

The victim had marks on her wrists consistent with being bound, bruises, and a cut on her head.

When police arrived, an officer entered the garage, where there was a strong smell of exhaust, and saw Plantin lying unconscious on the ground. A vacuum hose was connected to the exhaust pipe of the running car, and a knife was on the floor near the driver's side door. Inside the car, the officer found a woman's shoe and a picture of the victim and Plantin duct-taped to the dashboard of the car. The officer saw that the overhead garage door had been clamped so that it would not open. Inside the victim's house, the police found empty rolls of duct or masking tape.

*The victim's statements in the hospital*

Emergency personnel took the victim to the hospital, and she lapsed into a coma. When she awoke from the coma a few days later, the victim spoke with Janet Polley, a social worker. The victim told Polley that she could not believe that Plantin had tried to kill her. The victim also told Laura Harris, a nurse at the hospital, that appellant had tried to kill her.

While still at the hospital, the victim also spoke with her brother about the incident. She told her brother that when she came home the day of the incident, Plantin was waiting for her, and he had a knife. Plantin then emptied out the victim's purse, looking for her gun, and then he hit the victim, causing her to lose consciousness. The victim awoke on the couch, and tried to flee through the front door. Plantin grabbed her, and she yelled as Plantin pushed her back into the house. Plantin dragged the victim through the house and took her to the garage. Plantin kept the victim in the garage while the car in the garage was running and forced her to inhale the exhaust fumes. The victim was able to escape from the garage after Plan-

tin lost consciousness from inhaling the fumes.

*The victim's taped interview with Sergeant Michael Green*

Approximately one week after the incident, Sergeant Michael Green interviewed the victim at the Cross home. In the taped interview, the victim recounted the incident, telling Green that Plantin grabbed her by the back of the neck when she walked into her house and then put a knife to her throat. Plantin threw the victim on the floor; she hit her head against the floor and started bleeding. Plantin then duct-taped the victim's wrists and ankles. The victim tried to escape out the front door and screamed for help, but Plantin restrained her and then dragged her to the garage. Plantin told the victim that they would die together and forced the victim to stay in the car. Plantin hit the victim every time she attempted to escape, but the victim was able to grab the keys and turn the car off. After retrieving the keys and restarting the car, Plantin continued his attempt to asphyxiate the victim by forcing her to inhale the exhaust fumes.

*The victim's testimony at trial*

At trial, the victim's testimony about the incident differed substantially from the statements she had made at the hospital and in her taped interview. The victim testified that she did not remember many of the statements she allegedly made to Cross, Soderstrom, Polley, or Harris. She testified that on the day of the incident she arrived home around 4:45 p.m. and found Plantin was inside the house. Plantin put a knife to her throat and then the victim may have tripped on the carpet. The victim fell to the floor and cut her eye. The victim testified that the next thing she remembered was sitting on the couch with bound hands and feet. The victim tried to make it to the front door, but Plantin

stopped her and told the victim that he wanted to die. Plantin and the victim went to the back of the house, arguing about Plantin's plan to commit suicide.

The victim did not remember how she and Plantin got into the car. Once in the car in the garage, the victim attempted to dissuade Plantin from carrying out his suicide plan. Plantin lay down with his face near the car's exhaust pipe, and the victim tried to pull him away. The victim then heard Soderstrom's voice from outside the garage and asked for help. The victim testified that in the interview with Green she did not always tell the truth. Finally, the victim testified that she loved Plantin, hoped to reconcile with him, and had been in contact with him.

*Plantin's testimony at trial*

At trial, Plantin testified on his own behalf. He stated that on the day of the incident, he ran into the victim at a gas station, and she gave him the key to her home. Plantin used the key to enter the house, and when the victim returned, Plantin confronted her about drug paraphernalia he found in her house. The victim began screaming and Plantin pushed her into the living room where the victim fell and cut her head. When she got up, the victim was screaming, so Plantin slapped her several times and told her to "snap out of it." The victim then lay on the couch and began crying. Because Plantin thought that he had gravely injured the victim, he taped her wrists so she would not call Cross. Plantin then cut the phone lines to the house and drove his car into the garage. He was so distraught about injuring the victim that he decided to kill himself. Plantin was attempting to asphyxiate himself in the garage when the victim entered the garage through a service door. The victim tried to stop Plantin from committing suicide, but then Plantin lost consciousness. Plantin denied threat-

ening the victim with a knife, dragging her to the garage, or attempting to kill her.

## ISSUES

I. Did the district court abuse its discretion by admitting the victim's statement to Green as substantive evidence?

II. Did the district court abuse its discretion by admitting as impeachment evidence the statements the victim made to Polley, Harris, and Soderstrom?

III. Did the district court abuse its discretion by admitting expert testimony on battered-woman's syndrome?

IV. Was Plantin denied his constitutional right to a unanimous jury verdict?

V. Did Plantin receive ineffective assistance of counsel?

VI. Did the district court have a conflict of interest and, if so, does this conflict warrant a reversal of Plantin's conviction?

## ANALYSIS

### I.

Plantin argues that the district court abused its discretion when it admitted into evidence the victim's statement to Green. Specifically, Plantin argues that (1) under the totality of the circumstances, the victim's statement did not have the guarantees of trustworthiness necessary for admittance under Minn. R. Evid. 803(24), the

catch-all hearsay exception, and (2) the admission of the statement violated his right to confrontation. We disagree.

■ "Evidentiary rulings rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the trial court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003) (citation omitted).

■ The district court ultimately determined that the victim's statement to Green was admissible as substantive evidence under Rule 803(24). The Rule provides that the district court may admit into evidence

a statement not specifically covered by any of the foregoing [hearsay] exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Minn. R. Evid. 803(24).

*State v. Ortlepp*, 363 N.W.2d 39, 44 (Minn.1985), sets forth the standard for determining whether the district court abused its discretion in admitting evidence under Rule 803(24).[1] In *Ortlepp*, the

---

1. Plantin argues that *Ortlepp* is not applicable after the United States Supreme Court decision in *Idaho v. Wright*, 497 U.S. 805, 826–27, 110 S.Ct. 3139, 3152–53, 111 L.Ed.2d 638 (1990). But the *Wright* decision deals with an unavailable declarant. *Id.* at 814, 110 S.Ct. at 3146. Here, the declarant—the victim— actually testified. Because the victim was an

available declarant, this case is similar to *Oliver v. State*, 502 N.W.2d 775, 777 (Minn. 1993). In *Oliver*, the hearsay declarant was available and testified at trial. *Id.* Based on these facts, the Minnesota Supreme Court applied the *Ortlepp* four-step test to determine if the testimony was admissible. *Id.* In light of

Minnesota Supreme Court concluded that an accomplice's hearsay statement, which the accomplice later claimed at trial was false, had sufficient circumstantial guarantees of trustworthiness and was admissible under Rule 803(24). *Id.* Under *Ortlepp,* a hearsay statement is admissible under Rule 803(24) when: (1) there is no confrontation problem presented by the admission of the statement as substantive evidence because the declarant testifies, admits making the statement, and is available for cross-examination; (2) there is no dispute that the declarant made the statement or about what the statement contained; (3) the reliability of the statement is increased because it was made against the accomplice's penal interest; and (4) the statement "is consistent with all the other evidence the state introduce[s], evidence which point[s] strongly toward" the guilt of the accused. *Id.*

Here, the victim testified, she admitted making the prior statements, and Plantin had the opportunity to cross-examine her; the first part of the *Ortlepp* test is therefore satisfied. Further, there was no dispute that the victim made the statement and the contents of the statement were undisputed; thus satisfying the second part of the test. Finally, the victim's statement to Green was consistent with the evidence introduced at trial that pointed to Plantin's guilt; the fourth part of the test is thus satisfied.

The third part of the *Ortlepp* test generally requires that the victim's statement to Green be against her own penal interests. But this court has found that the third *Ortlepp* factor may be satisfied even when a declarant's statement is not against the declarant's penal interest if the declarant is hostile to the state and supportive of the defendant. *See, e.g., State v. Whiteside,* 400 N.W.2d 140, 146 (Minn.App.1987) (con-

cluding that the district court did not abuse its discretion by admitting under Minn. R. Evid. 803(24) a prior consistent statement of defendant's girlfriend that incriminated defendant, even though the statement was not against the girlfriend's penal interests), *review denied* (Minn. Mar. 18, 1987). We determined that the statement was against the girlfriend's interests because she was clearly hostile to the prosecution and supportive of her boyfriend, the defendant. *Id.*

Here, the victim testified that she and Plantin "were trying to reconcile things." Because the victim's statement was against her interests in a relationship with Plantin, the third part of the *Ortlepp* test is satisfied. *See Whiteside,* 400 N.W.2d at 146 (stating that statements not necessarily against penal interests can still satisfy the third part of the *Ortlepp* test). The district court did not abuse its discretion when it admitted the victim's statement to Green as substantive evidence under Rule 803(24) because, under the *Ortlepp* test, the statement bore sufficient circumstantial guarantees of trustworthiness.

*Right to Confrontation*

▪ Plantin also argues that the admission of the victim's statement to Green violated his right of confrontation. We disagree. Both the United States Constitution and the Minnesota Constitution afford an accused the right to confront witnesses who testify against him. *See* U.S. Const. amends. VI, XIV; Minn. Const. art. 1, § 6. The primary objective of the Confrontation Clause is to force declarants to testify and undergo cross-examination so that the jury may judge the witness' credibility. *State v. Byers,* 570 N.W.2d 487, 494 (Minn.1997). But as the Supreme Court recognized, "the Confrontation Clause guarantees only 'an *opportunity* for

the *Oliver* precedent, we apply the *Ortlepp* test here.

effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)). *See also State v. Greenleaf,* 591 N.W.2d 488, 502 (Minn. 1999) (quoting the preceding language from *Stincer*).

Here, the victim testified in the presence of the jury, and Plantin had ample opportunity to cross-examine her about her statement to Green. Plantin clearly was not satisfied with the victim's answers and lapses in memory, but that does not mean that he was denied his constitutional right of confrontation. Because Plantin had the opportunity to cross-examine the victim before the jury, his right to confrontation was not violated.[2]

■ Finally, Plantin argues that the admission of the statements used as impeachment evidence raises the same confrontation problem as the admission of the victim's statement to Green. However, this challenge fails for the same reasons discussed above.

## II.

Plantin argues that the district court abused its discretion when it admitted statements made by the victim to Polley, Harris, and Soderstrom. We disagree.

■ Plantin first argues that the jury may have considered the statements as substantive evidence because the district court did not make an explicit ruling the statements were being admitted for impeachment purposes only. But the district court instructed the jury that some testimony in the trial was admitted only for impeachment purposes and read the instruction on impeachment evidence. In addition, in the course of discussing impeachment evidence, the district court instructed that, "in the case of Bernadette Patin, evidence of any statement she may—I'm sorry, evidence of any statement she may have made to Green may be considered by you for all purposes." Because the district court differentiated between the victim's statement to Green, which the jury could consider for substantive purposes, and all other statements that the victim made, which the jury could consider only for impeachment purposes, Plantin's argument fails.

■ Plantin next argues that the jury was likely to consider these disputed statements substantively because the state's closing argument did not distinguish between testimony that was offered substantively from that offered for impeachment purposes. But a defendant who fails to object to the prosecutor's closing argument or to seek a cautionary instruction ordinarily waives the right to have the issue considered on appeal. *State v. Parker,* 353 N.W.2d 122, 127 (Minn.1984). Absent an objection at trial or a request for a

---

**2.** Plantin asserts that *Crawford v. Washington,* —— U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), is relevant to the determination of his confrontation clause challenge. In *Crawford,* the Supreme Court concluded, "where testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 1374. But the Court stated in a footnote on an earlier page in the opinion, "Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [her] prior testimonial statements." *Id* at 1369 n. 9. Under the facts of this case, *Crawford* does not support Plantin's contention that his right to confrontation has been violated.

cautionary instruction, we will grant relief only when there is prosecutorial misconduct and such conduct is unduly prejudicial to the defendant. *See id.* at 127–128 citing *State v. Gunn,* 299 N.W.2d 137, 138 (Minn. 1980); *State v. Flom,* 285 N.W.2d 476, 477–78 (Minn.1979).

■ Here, appellant did not timely object to the prosecutor's closing statement, so we review the statement to determine if the prosecutor committed misconduct and if that conduct was unduly prejudicial. The prosecutor's closing statement referred to the impeachment testimony as it summarized the evidence presented at trial. The prosecution told the jury:

> You then heard again from David Soderstrom who told you about what the victim, Ms. Patin, told him in the hospital. And you heard from Ms. Polley and Ms. Harris who again provided statements consistent with her state of mind immediately, or shortly after coming out of a coma, with regard to this defendant's intent.

We conclude the prosecution's statement does not rise to the level of prosecutorial misconduct that is unduly prejudicial; Plantin's argument therefore fails.

### III.

■ Plantin argues that the district court abused its discretion when it admitted expert testimony on battered-woman syndrome. We disagree.

"The admission of expert testimony is within the broad discretion accorded a trial court, and rulings regarding materiality, foundation, remoteness, relevancy, or the cumulative nature of the evidence may be reversed only if the trial court clearly abused its discretion." *State v. Ritt,* 599 N.W.2d 802, 810 (Minn.1999) (quotation and citation omitted); *see also State v. Grecinger,* 569 N.W.2d 189, 194 (Minn.

1997) (holding reversal requires "apparent error").

When considering whether to admit expert testimony, the district court must determine whether the testimony will assist the jury in resolving factual questions presented at trial. Minn. R. Evid. 702. Here, the prosecution offered expert testimony on battered-woman syndrome to explain why the victim, who told multiple people about the incident before trial, recanted her story at trial and gave testimony that tended to exculpate Plantin.

In *Grecinger* the Minnesota Supreme Court concluded:

> [E]xpert testimony on battered[-]woman syndrome presented during the prosecution's case-in-chief is admissible if it is introduced after the victim's credibility has been attacked by the defense, *see* Minn. R. Evid. 608(a), if it helps the jury understand the victim's inconsistent statements or delay in seeking prosecution of the batterer, *see* Minn. R. Evid. 702, and if the expert merely describes the syndrome and its characteristics and does not offer an opinion as to whether the victim suffers from it, thereby reducing the risk of unfair prejudice to the defendant, *see* Minn. R. Evid. 403.

*Grecinger,* 569 N.W.2d at 197. In *Grecinger,* the prosecution's use of expert testimony was appropriate "because it could help the jury understand behavior that might otherwise undermine the complainant's credibility." *Id.* at 196.

Here, the district court specifically found that (1) the victim's credibility had been attacked by Plantin, and (2) the expert testimony helped the jury understand behavior that would have otherwise undermined the victim's credibility. In addition, the district court properly limited the scope of the expert testimony to a description of the syndrome and its characteristics, thereby precluding an opinion on

whether the victim suffered from the syndrome, as required by *Grecinger*. In light of *Grecinger*, the district court did not abuse its discretion in allowing expert testimony on battered-woman syndrome.

## IV.

■ Plantin argues that he was denied his constitutional right to a unanimous verdict. Specifically, Plantin contends that his constitutional right was violated because the district court did not deliver an adequate unanimity instruction to the jury. We disagree.

Defendants have a constitutional right to a unanimous verdict. Minn. R.Crim. P. 26.01, subd. 1(5); *see Burns v. State*, 621 N.W.2d 55, 61 (Minn.App.2001), *review denied* (Minn. Feb. 21, 2001). Although a Minnesota appellate court has never directly answered the question, the majority of jurisdictions that have dealt with the issue of whether a defendant's right to a unanimous jury is violated when the district court's instruction does not clearly outline the unanimity requirement have held that the right is not violated when the jury is polled. *See, e.g., State v. Kircher*, 189 Wis.2d 392, 525 N.W.2d 788, 792 (1994) (reasoning that defendant has a constitutional right to a unanimous verdict, not to a unanimity instruction, and that polling the jury satisfied the constitutional right); *Hanson v. State*, 258 Ga. 564, 372 S.E.2d 436, 438–39 (1988) (concluding that polling the jury satisfies the right to unanimity); *State v. Burns*, 280 S.W.2d 119, 123 (Mo. 1955) (holding error is lacking when defense counsel: (1) fails to object to the court's lack of a unanimity instruction; (2) fails to request such an instruction; or (3) fails to request the jury be polled); *State v. Sturdivant*, 304 N.C. 293, 283 S.E.2d 719, 728 (1981) (stating that the right to have the jury polled when no unanimity instruction is delivered satisfies defendant's right to a unanimous verdict). Here, the district court polled the jurors after the verdict was read to ensure unanimity.

■ We adopt the reasoning of the majority of jurisdictions and conclude that the unanimity requirement is satisfied if the district court polls the jury after the verdict has been reached to ensure unanimity. Here, Plantin's unanimity challenge fails because the district court polled the jurors to ensure unanimity. Although the better protection is to give a clear jury instruction on the unanimous verdict requirement, we conclude that polling the jury sufficiently safeguarded Plantin's constitutional right to a unanimous verdict, and we decline to reach Plantin's argument that the district court's unanimity instruction to the jury was inadequate.[3]

## V.

■ Plantin argues that because his lawyer did not investigate a witness who allegedly would have testified that Plantin had a key to the victim's house and did not

---

**3.** The appropriate unanimous verdict jury instruction is:

> In order for you to return a verdict, whether guilty or not guilty, each juror must agree with that verdict. Your verdict must be unanimous.
> You should discuss the case with one another, and deliberate with a view toward reaching agreement, if you can do so without violating your individual judgment. You should decide the case for yourself, but only after you have discussed the case with your fellow jurors and have carefully considered their views. You should not hesitate to reexamine your views and change your opinion if you become convinced they are erroneous, but you should not surrender your honest opinion simply because other jurors disagree or merely to reach a verdict.

Minn. CRIMJIG 3.04 (1999).

break into the house on the day of the incident, he received ineffective assistance from counsel. We disagree. "The defendant must affirmatively prove that his counsel's representation 'fell below an objective standard of reasonableness' and 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [(citation omitted)] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Gates v. State,* 398 N.W.2d 558, 561 (Minn. 1987) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984)). But an attorney's decisions regarding trial tactics are discretionary, and we will not later review those decisions in the ineffective-assistance-of-counsel analysis. *Voorhees v. State,* 627 N.W.2d 642, 651 (Minn.2001). Plantin's attorney apparently refused to investigate the witness Plantin complains of because the investigation would have "hurt more than it would help." Plantin's challenge fails because his attorney's decision not to investigate a witness was a strategic decision related to trial tactics, and we will not review this type of decision.

## VI.

Plantin argues that the district court judge had a conflict of interest because she was the judge who granted the victim an order for protection against Plantin in April 2002. Plantin argues that several of the district court's evidentiary rulings reflected this bias. But Plantin never objected to the district court judge before or at trial. After a defendant submits to trial before a judge without objecting to the judge on the basis of bias, we will reverse the defendant's conviction only if the defendant can show actual bias in the proceedings. *State v. Moss,* 269 N.W.2d 732, 735 (Minn.1978). Plantin has not demonstrated any actual bias by the district court judge in his case.

## DECISION

Because we conclude: (1) the district court did not abuse its discretion in its evidentiary rulings; (2) Plantin was not denied his constitutional right to a unanimous jury; (3) Plantin received effective assistance of counsel; and (4) Plantin failed to prove that the district court was actually biased against him, we affirm Plantin's conviction.

**Affirmed.**