**STATE of Minnesota, Respondent,**

v.

**Tony Lawrence BORCHARDT,
Appellant.**

No. C7–90–2314.

Supreme Court of Minnesota.

Dec. 27, 1991.

John M. Stuart, State Public Defender, Susan Hauge, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Lisa A. Berg, Asst. County Atty., Minneapolis, for respondent.

YETKA, Justice.

Appellant, Tony L. Borchardt, was convicted of murder in the first degree in Hennepin County District Court. He appeals his conviction on the grounds that he was denied his constitutional right to present a defense—he sought to admit expert testimony that he suffered from "male sexual victimization" syndrome and that, as a result of the syndrome, he was sufficiently provoked to reduce the offense in this case from first-degree murder to manslaughter. We affirm the conviction.

The facts are as follows:

Appellant quit high school during the 11th grade and later received his GED. In April 1988, appellant entered the Army Reserves and completed 3 months of basic training, but in September 1988, he stopped going to "drills," the weekend training sessions necessary to maintain active status. He worked at odd jobs from late 1988 to early 1989. In September 1989, appellant decided that he wanted to return to the military. He learned that he would have to complete 6 months of drills in the Reserves to qualify for active duty, and he began attending drills in October 1989. He was 17 years old at this time.

The following account of appellant's relationship with the victim, Alan Meece, is based on appellant's testimony at the trial. Appellant met Meece at about the time he rejoined the Reserves. Meece was the first sergeant for his unit and had direct authority over appellant. Meece later was reassigned as a personnel sergeant, giving him less authority and making him essentially a "paper pusher." Meece knew that appellant wanted to get into active duty, and he helped appellant with the paperwork necessary to get him into the October drill. Appellant testified that Meece paid particular attention to him "almost right away." The two men had frequent contact from October on, and they often would talk informally, go to lunch, or go for a drive. Appellant testified that, during this stage of their relationship, Meece was like a father figure or counselor to him.

One evening in December, Meece didn't feel like driving home to Hutchinson and suggested to appellant that they go to the Bachelor Officer's Quarters ("BOQ"), a motel on the Air Force base near Fort Snelling. At the motel, Meece asked appellant to sit with him on the bed. Meece later asked appellant to take his shirt off, and Meece then rubbed appellant's shoulders and chest. During this time, the two were talking about various things, including their sexual relations with their wives. Appellant testified that they spent about 2 hours at the BOQ and that Meece tried to persuade him to stay longer, prolonging the goodbye by hugging him.

Appellant stated that he didn't "feel right" about this meeting and tried to avoid Meece, but he didn't say anything about it to others because Meece "is married and goes to church and all that." However, the two men went to the BOQ again in late January. Appellant could not recall whose suggestion it was to go there. At this meeting, they again sat on the bed together. Meece asked appellant to remove his shirt, and they again discussed sex. At one point, Meece touched appellant's sexual organ. Appellant jumped up and asked Meece what he was doing. Meece then asked appellant to touch him, and appellant said, "I think it's time for me to go."

When appellant began to leave, Meece said, "If you don't do what I tell you, I can get you thrown out of the Reserves. There's no chance for active Army." Meece then asked appellant to perform oral sex, which appellant did. Appellant left immediately afterwards. As he was leaving, Meece said, "If you tell anybody, they won't believe you. Then I'll kick you out of the Army." Appellant testified that he didn't feel physically threatened, but felt trapped by Meece's threat.

On February 4, 1990, appellant and Meece met at the BOQ for a third time. Earlier that day, they had bumped into each other at Fort Snelling, and Meece gave appellant the key to a room at the BOQ. Appellant testified that he went to the BOQ even though he didn't want to go. Meece again asked appellant to perform oral sex. Appellant did so because he "knew the threat." Appellant did not tell anyone about the sex acts because it bothered him and it wasn't the kind of thing he wanted to tell people.

On February 11, Meece telephoned appellant and asked if he wanted to do something with him; defendant said no. Meece asked appellant to call him the next day. Appellant called Meece at about 5:30 p.m. on February 12, and they arranged to meet at Fort Snelling at 8:00 that night. On February 8, appellant had purchased a handgun (a Llama 380 automatic) and had been carrying it with him since then. Appellant testified that he loaded the gun on the day of purchase. He said that he bought the gun for protection because his wife lived in a rough neighborhood.

Appellant got into Meece's car when he arrived at the parking lot at Fort Snelling. Appellant testified that he asked Meece to leave him alone and that Meece then put his hand on appellant's leg and said, "But remember what I told you." Appellant then hit Meece's hand away, yelled "no," and shot Meece in the head.

Appellant gave a different version of the killing in his statements to his friends and the police. He told the detectives that he killed Meece because he wanted to be an assassin and wanted to see if he could do it, not because of the "fag" stuff. Appellant said that when he called Meece on February 12, he knew that he would kill him—he already had loaded the gun and wiped the shell casing so there would be no prints.[1] He stated that, as he and Meece were sitting in the car, he got Meece to turn his head away by asking what he thought of a Cadillac "over there." When Meece turned his head away, appellant said, "Say goodnight." and shot him in the back of the head.

In his statement to the police following his confession, appellant answered "yes" to the question: "Was your intention to shoot and kill Alan when you met him at the Reserve base?" Appellant told a detective that his mistake had been in choosing somebody he knew as the first person he killed. The detective testified that appellant expressed no remorse about the killing and, in fact, bragged about it.

Appellant's behavior prior to the shooting and his statements to friends prior to his arrest also differ from his testimony at trial. For about a year prior to the shooting, appellant had talked to his friend, Shawn Kylander, about wanting to be a hired hit man. Appellant said that his signature manner would be to shoot the victim in the back of the head. On the afternoon of the killing, appellant told a friend that he wasn't going to school that evening because "he had to take care of some business." When appellant met Meece that night, the loaded pistol was tucked into the back of his waistband.

About 30 minutes after the shooting, appellant called Kylander and told him that he had shot somebody. Appellant said that he had done it to see if he could "back up his words," referring to previous conversations in which he told Kylander that he wanted to be a hired hit man. Kylander testified that appellant called him many times after his arrest, asking him to

---

1. A fingerprinting expert testified that appellant's prints were on the gun, but there were no prints on the spent cartridge.

change the story. Appellant told Kylander that he hadn't had sexual contact with Meece, but would say he had in order to establish a defense. On the day after the shooting, appellant told his friend, Tywan Beasley, that he had killed somebody and described how he got Meece to look away so he could shoot him in the back of his head.

On July 17, 1990, the trial judge held a pretrial hearing to determine whether the defense could introduce expert testimony regarding the psychological characteristics of men who had been sexually victimized by other men. The court heard testimony from Walter H. Bera, a licensed psychologist and family therapist. Bera received his Master of Science in educational psychology in 1986, and he is completing a Ph.D. in family social sciences. Since 1978, Bera's practice has focused on sexual abuse issues. At the time of the hearing, Bera had been working at the Metropolitan Clinic of Counseling for 3 years where his practice focused on adolescents and adults (mainly males) who are victims of sexual abuse. Bera estimated that he has been involved in hundreds of cases involving sexual abuse. He also is writing a book about male adolescent sexual abuse victims and offenders.

Defense counsel set out for Bera a hypothetical situation based on what occurred between appellant and Meece. Bera did not speak with or examine appellant, so his proffered testimony was based solely on the hypothetical. Bera opined that a young male in this situation would be suffering from a type of post-traumatic stress disorder. Bera testified that post-traumatic stress disorder often is used to label the psychological consequences of sexual abuse. For the past 20 years, researchers have studied the effects of sexual abuse on women and children, but research on the psychological effects of sexual abuse on male adolescents has developed only in the past 2 to 5 years.

Bera stated that the existing literature on male sexual victimization recognizes certain dynamics: the sexual abuse typically occurs within a relationship of trust and nurturing; the victim goes along with the sexual acts because he trusts the offender and feels powerless; and the victim might react to the situation by becoming depressed, acting hyper-masculine, abusing alcohol or drugs, becoming a sex offender, or behaving in an antisocial, violent or impulsive manner (*e.g.*, theft, truancy, assault). A victim's specific reaction depends upon his preexisting character traits.

Bera stated that there is general agreement in the literature as to the potential effects on male victims, but he also stated that there are several areas that need further research: why some victims become sex offenders and others don't, why one-third of the victims display no symptoms at all, and how preexisting character traits affect subsequent behavior. When asked whether homicide is a common reaction, Bera stated, "[T]hat is not established, but acting out in angry or violent ways is established. But there's limited knowledge of how much of it is associated with homicide." The trial judge excluded Bera's testimony because "male sexual victimization" has not been commonly accepted in the medical community. The judge stated that, although this court has acknowledged battered woman syndrome, it has not recognized rape trauma syndrome, which is the subject of much more literature and is more accepted in the medical community than is male sexual victimization. The court also distinguished male sexual victimization from battered woman syndrome on the grounds that battered woman syndrome provides a clear profile whereas male sexual victimization only provides a set of potential symptoms, and a third of the victims display no symptoms at all. The court also found that Bera's testimony failed to show that male sexual victimization has been accepted to the same level as battered woman syndrome.

The decision of whether to admit expert opinion testimony is within the trial court's discretion, and a reviewing court will not reverse unless there is an "apparent error." *State v. Myers*, 359 N.W.2d 604, 609 (Minn.1984). We find no basis for error here.

Minn.R.Evid. 702 controls the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

When applying Rule 702, this court has required the testimony to be helpful to the jury. If the testimony is within the jury's knowledge and experience and it would not add "precision or depth" to the jury's ability to reach conclusions, it does not meet the helpfulness test. *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980).

■ In previous cases addressing the admissibility of expert testimony regarding psychological syndromes, this court has considered the reliability and accuracy of the proffered evidence in determining whether the helpfulness test has been met. In *State v. Saldana,* 324 N.W.2d 227 (Minn.1982), we held that the state could not introduce expert opinion that the alleged rape victim suffered from "rape trauma syndrome" and was not fabricating her allegations. One basis for this holding was our conclusion that the "scientific evaluation of rape trauma syndrome has not reached a level of reliability that surpasses the quality of common sense evaluation present in jury deliberations." *Id.* at 230. *Cf. State v. Hennum,* 441 N.W.2d 793, 798–99 (Minn.1989) (testimony on battered woman syndrome admissible because the theory is "beyond the experimental stage" and has gained a substantial scientific acceptance, unlike rape trauma syndrome).

■ In the instant case, Bera's testimony at the pretrial hearing did not establish that the theory of male sexual victimization has reached the required level of scientific acceptance. Male sexual victimization has not received significant attention in the literature until the past few years. Bera admitted that there is less research on male sexual victimization than there is on rape trauma syndrome or battered woman syndrome, and the trial judge relied on this

fact in excluding the testimony. The court also noted that several important components of male sexual victimization syndrome have not been explained (*e.g.,* why only some victims become offenders and why one-third of victims are asymptomatic). This is an ample basis for excluding the testimony, especially in light of the trial court's broad discretion to make evidentiary rulings.

■ Even if Bera's testimony met the scientific acceptance or reliability threshold, it would not be helpful to the jury. This court has set a demanding standard for finding that expert psychological testimony is beyond the jury's common experience. *State v. Hennum* illustrates our hesitancy to invade the jury's factfinding role by introducing unhelpful expert opinion. In *Hennum,* we relied on the fact that a majority of states had already found that battered woman syndrome is beyond the understanding of the average person because of the "common misconception" that a normal, reasonable person would not remain in such an abusive relationship. 441 N.W.2d at 798.

Bera's expert testimony would not add much to the jury's common sense evaluation. The testimony at trial gave the jury ample information on which to base its conclusions. The relationship was brief (approximately 4 months) and there were only two alleged incidents of sexual contact. Thus, it was possible for appellant to give testimony that fully described the relationship, thereby giving the jury a complete picture of the dynamics of the relationship and how it affected appellant.

■ Expert testimony also may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Minn.R.Evid. 403. In *Saldana,* we noted that expert testimony may have a prejudicial impact "by creating an aura of special reliability and trustworthiness." 324 N.W.2d at 230. In this case, Bera's testimony was based on a relatively undeveloped theory, but his status as an expert witness likely would have caused the jury to accept the theory as reliable and estab-

lished. Since the proffered testimony was only minimally probative of appellant's state of mind, it was properly excluded under Rule 403.

■ Finally, it is extremely unlikely that the proffered expert testimony would have affected the jury's verdict. Premeditation may be formed "virtually instantaneously," *State v. Buchanan,* 431 N.W.2d 542, 547 (Minn.1988), and it is the jury's role to weigh the evidence regarding the defendant's state of mind. *State v. Anderson,* 379 N.W.2d 70, 78 (Minn.1985), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986). There was ample evidence at trial that appellant planned and intended to kill Meece. Appellant had talked about wanting to be a hired hit man, stating that his signature method would be a shot in the back of the head. On the day of the killing, he told a friend that he had some "business" to take care of that evening; when he met Meece, he carried a loaded pistol. After the shooting, appellant described to his friends and the police how he got Meece to turn away so he could shoot him in the back of the head. He told his friends and the police that he had shot Meece just to see if he could back up his words about being a hit man. Thus, even if Bera's testimony would have helped the jury understand why appellant felt he had to kill Meece rather than take other action to end the sexual activity, the opinion testimony would not have counteracted the ample evidence of premeditation.

Our decision in this case does not foreclose the use of expert testimony on male sexual victimization syndrome in future cases. If a case arose where such testimony would aid the jury's understanding of an issue and where an adequate body of scientific literature supported the testimony, the trial court could admit expert testimony on the syndrome. In this case, however, neither of these requirements has been met: the literature on the syndrome is not yet developed to the level of scientific acceptance, and the syndrome evidence does not lend itself to the facts of this case.

Accordingly, the conviction must be affirmed.