**STATE of Minnesota, Respondent,**

v.

**Leonard Allen GRECINGER,
Sr., Appellant.**

No. C1–95–1596.

Supreme Court of Minnesota.

Sept. 18, 1997.

Joanna M. Wiegert, Duluth, for appellant.

Paul Kempainen, Asst. Atty. Gen., St. Paul, Alan Mitchell, St. Louis County Atty., Duluth, for respondent.

## OPINION

TOMLJANOVICH, Justice.

Defendant Leonard Allen Grecinger, Sr., was convicted of attempted murder in the second degree and assault in the third degree and was sentenced to 153 months in prison. The court of appeals affirmed this conviction. We must determine whether expert testimony on battered woman syndrome is admissible in the prosecution's case-in-chief against an alleged batterer. We affirm the court of appeals. We hold that such testimony properly was admitted in the prosecution's case-in-chief under Minn. R. Evid. 608(a) when it was presented after the alleged victim's credibility had been attacked by the defense during its opening statement and during cross-examination; when it met the requirements of Minn. R. Evid. 702, because it helped the jury understand the alleged victim's behavior; and where, in accordance with *State v. Hennum*, 441 N.W.2d 793 (Minn.1989), the expert testimony was limited to a description of the syndrome and its characteristics, and the expert did not testify on the ultimate fact of whether the alleged victim actually suffered from battered woman syndrome.

Grecinger had been in an on-and-off relationship with the victim, Barbara Skoglund,

for about three years, during which they lived together at various times. On September 28, 1991, Grecinger and Skoglund attended a memorial run for the BPM motorcycle club and a party that took place afterward. The events that took place on that day and the day before are in drastic dispute. At trial, Skoglund testified that on the night before the party, Grecinger grabbed her by her hair, slapped her, threw her to the floor, and choked her until she lost consciousness. The next day, Skoglund said that she did not want to attend the party but, according to her testimony, Grecinger insisted that she go. Once at the party, Skoglund found Grecinger kissing a woman who was sitting on his lap. She testified that she threw the woman off his lap but did not get into a fight with the woman. Skoglund then told Grecinger that their relationship was over and went into the bathroom.

Skoglund further testified that Grecinger followed her into the bathroom, closed the door, and beat her. Grecinger grabbed her by the hair, threw her to the floor, kicked her, and choked her until she lost consciousness. During this time, Grecinger allegedly told her, "[I]f you leave me, I'm gonna kill you; if I can't have you, * * * no one's gonna." When Skoglund regained consciousness, she started screaming for help, and Grecinger choked her again until she lost consciousness. When she regained consciousness a second time, Grecinger demanded that she get on her knees, hug him, and apologize for making him angry. Grecinger then told her to walk out of the bathroom with her head up high without crying or looking at anyone. Grecinger followed Skoglund outside and told her to get on his motorcycle. Skoglund started to run away from Grecinger, but he caught her and dragged her back over the dirt road to his motorcycle. Again, he told her to get on the motorcycle. She complied, and they drove off.

Skoglund testified that during the motorcycle ride, Grecinger slapped her in the face. Upon arriving at Grecinger's house, Skoglund broke away and ran down the street, screaming for help. Two women stopped and let her into their car.[1] Skoglund asked them to take her to the home of her friend, Char Copiskey, where she spent the night. The next morning, Copiskey suggested that they go to the Battered Women's Coalition ("Coalition"). At the Coalition, pictures were taken of Skoglund. Skoglund was then taken to the emergency room because she was fading in and out of consciousness.

Skoglund was admitted to the hospital under an assumed name out of concern for her safety, and she remained there for five days. She suffered from numerous injuries, including swelling and bruising around both eyes; a fracture in her left orbital bone; bleeding in her right eye; bruising and abrasions on her face, ear, and neck; a swollen lip; swelling around her vocal cords consistent with choking; bruising and swelling on her shoulders, chest, arms, and legs; an abrasion on her abdomen; and a tender scalp.[2]

Two law enforcement officers visited Skoglund in the hospital and tried to get a statement from her. Initially, Skoglund refused to talk to them because she did not want to involve the police; however, after being assured that Grecinger would not be arrested except upon her request, she agreed to give a statement. She told one of the officers that the night before the party, Grecinger had choked her until she passed out, and that at the party, he followed her into the bathroom, where he threw her to the floor, slapped her, and again choked her into unconsciousness. When she gave the statement to police, Skoglund asked them not to press charges against Grecinger at that time.

Skoglund also testified that while she was in the hospital, Copiskey brought her a letter from Grecinger in which he apologized for what he did and asked that she speak with him. When Skoglund called Grecinger, he

---

1. Skoglund testified that one of the women gave her an address and phone number and asked Skoglund to call and let her know that she was all right. However, Skoglund lost the information, and was unable to locate the women afterward.

2. Three doctors testified as to the injuries suffered by Skoglund. One doctor said that the neck injuries on Skoglund could only have been inflicted from choking.

promised he would leave her alone if she did not press charges against him. He also promised her he would seek treatment for his anger.

Skoglund testified that she went back to the Coalition after leaving the hospital to retrieve the pictures that were taken of her. She then gave the pictures to one of her sisters for safekeeping.[3] A few weeks later, Skoglund resumed her relationship with Grecinger, after he told her that he had stomach cancer and would not live much longer. At Grecinger's insistence, Skoglund called the sheriff's department and recanted, claiming that her injuries actually had been inflicted by two unknown men who assaulted her when she left the party.

In her testimony, Skoglund admitted that she lied to some people about the cause of her injuries because she was afraid of Grecinger.[4] However, Skoglund also testified that she had previously identified Grecinger as her assailant to others, including Copiskey, a police investigator, a worker from the Coalition, and two of her sisters.[5] On several occasions in 1992 and 1993, Skoglund petitioned for orders for protection against Grecinger; however, she either sought to have the petitions dismissed or failed to follow through on them, because she feared that Grecinger would harm her.[6] Finally, in June 1994, Skoglund sought to reopen the investigation against Grecinger for the alleged September 1991 assault, because she was afraid he was going to kill her.

When Grecinger took the stand, his version of events drastically differed from Skoglund's. Grecinger testified that the day before the memorial run, he told Skoglund he did not want her to accompany him to the run because she often embarrassed him in public. Grecinger denied that he was physically violent toward Skoglund that day.

Grecinger testified that at the party following the memorial run, a woman was sitting on his lap when Skoglund walked into the kitchen, grabbed the woman by her hair, and pulled her off of him. Although Grecinger tried to break up the fight, Skoglund wound up with her shirt torn, hair pulled out, scratches on her face, and a bloody lip. After fighting with the woman, Skoglund grabbed Grecinger by his hair and dragged him to the bathroom. According to Grecinger, Skoglund "went completely bananas" in the bathroom and kicked the toilet seat off the toilet, hit him with the toilet tank cover, and ripped the medicine cabinet off the wall. Skoglund then asked him to hug her and tell her he loved her. Grecinger denied hitting or choking Skoglund in the bathroom and maintained that he only tried to prevent her from hurting him and herself.

Grecinger testified that they then left the party to go home. As they neared his house, Skoglund jumped off the motorcycle and started running. Grecinger ran after her out of concern for her, but gave up after she jumped into a car with two men whom he believed she knew.

To support this testimony, numerous friends of Grecinger's testified that they did not witness any violence between Grecinger and Skoglund at the party. Several defense witnesses also corroborated Grecinger's testimony that Skoglund got into a fight with another woman at that party. The defense also attacked Skoglund's credibility, suggesting that the three-year gap between the time the incident occurred and the time Skoglund pursued prosecution demonstrated that she was not credible. For instance, during opening statements, Grecinger's attorney stated that for nearly three years, Skoglund had used the alleged incident to control Grecinger. Furthermore, Grecinger's attorney

3. These pictures were later retrieved by Skoglund and presented as evidence at the trial.

4. Skoglund admitted that initially she told one of her sisters that she was hit by a car.

5. All but one of these people testified (as did several doctors who treated Skoglund's injuries) that Skoglund had identified Grecinger as her assailant. However, Copiskey testified that when

Skoglund arrived at her house, Skoglund told her that she had been assaulted by two unknown men on a dirt road.

6. Skoglund admitted that she once lied to a judge regarding an order for protection she sought in May 1992. Skoglund said that Grecinger forced her to write a letter to the judge withdrawing her request for the order.

cross-examined Skoglund regarding her delay in seeking prosecution.

In response to the defense's attack on Skoglund's credibility, the prosecution sought to introduce expert testimony on battered woman syndrome. The court admitted the expert testimony over Grecinger's objection. As foundation for the expert testimony, a psychologist testified that she first treated Skoglund in October 1992. The psychologist testified that Skoglund reported symptoms of anxiety stemming from a physically abusive episode with her boyfriend one year earlier. The psychologist subsequently diagnosed Skoglund as suffering from posttraumatic stress disorder.

After Skoglund and the psychologist who treated her had testified, an expert witness testified regarding battered woman syndrome, which she described as a subset of posttraumatic stress disorder. The expert further testified that the symptoms of a woman suffering from battered woman syndrome can include feelings of terror, acceptance of blame for the battering, a negative self-image, isolation, denial or minimization of the abuse, and depression. She explained that many battered women do not report the abuse out of fear for their safety, denial of the abuse, fear that no one will listen, or hope that the batterer will change.

The jury convicted Grecinger of attempted murder in the second degree and assault in the third degree, and he was sentenced to 153 months in prison. On appeal to the court of appeals, Grecinger argued that the expert testimony should have been excluded because it was irrelevant and lacked proper foundation. The court of appeals affirmed Grecinger's conviction, holding that expert testimony on battered woman syndrome was properly admitted because it helped the jury understand the delay in reporting and the inconsistencies in the victim's testimony.[7] On appeal to this court, Grecinger argues that the expert testimony was improperly admitted, be-

cause it was not helpful to the jury and because it was merely duplicative of other witnesses' testimony about the reasons for the delayed prosecution.[8]

■ We note at the outset that traditionally we have proceeded with great caution when admitting testimony of expert witnesses, especially in criminal cases. An expert with special knowledge has the potential to influence a jury unduly. Special care must be taken by the trial judge to ensure that the defendant's presumption of innocence does not get lost in the flurry of expert testimony and, more importantly, that the responsibility for judging credibility and the facts remains with the jury. Thus, the court must ascertain whether such testimony is relevant, *see* Minn. R. Evid. 404(a), 608(a), whether it is helpful to the trier of fact, *see* Minn. R. Evid. 702, and whether its prejudicial effect substantially outweighs its probative value, *see* Minn. R. Evid. 403.

■ Under Minn. R. Evid. 608(a), the credibility of a witness can be supported by evidence in the form of an opinion only when the character of that witness has been attacked in that respect. *See State v. Fader*, 358 N.W.2d 42, 47 (Minn.1984). Because the victim's credibility can be attacked during cross-examination of the victim or even during opening statements, the prosecution need *not wait until rebuttal* to present expert testimony on battered woman syndrome. Rather, such testimony may be presented as rehabilitative evidence during the state's case-in-chief. *Cf., e.g., People v. Sanchez*, 208 Cal. App.3d 721, 256 Cal.Rptr. 446, 454 (1989) (holding that prosecution's presentation of expert testimony on child sexual abuse accommodation syndrome during case-in-chief was permissible, because the victim's credibility was already at issue), *cert. denied*, 493 U.S. 921, 110 S.Ct. 286, 107 L.Ed.2d 266 (1989).

---

7. The court of appeals also held that there was sufficient evidence to support a conviction and that the trial court did not abuse its discretion in excluding *testimony regarding an allegedly* fraudulent claim brought by Skoglund.

8. Although Grecinger raised three issues in his petition for review, his brief only challenges the admissibility of expert testimony on battered woman syndrome. This court has held that issues not argued in briefs are deemed waived on appeal. *Balder v. Haley*, 399 N.W.2d 77, 80 (Minn.1987).

Consequently, the admission of battered woman syndrome testimony during the state's case-in-chief in this case was proper under Minn. R. Evid. 608(a). By the time the expert testimony on battered woman syndrome was presented, Skoglund's credibility regarding her delay in seeking prosecution of Grecinger was already at issue. During opening statements, Grecinger's attorney suggested that during the gap in time, Skoglund used the alleged incident to control Grecinger.[9] Furthermore, when cross-examining Skoglund, Grecinger's attorney briefly questioned Skoglund regarding her delay in seeking prosecution.

Although the prosecutor asserted only that battered woman syndrome testimony was being offered to explain the delay in prosecution, such testimony arguably was responsive to other attacks against Skoglund's credibility. For instance, Grecinger's attorney stated that Skoglund was a liar because of the various stories she had told to explain her injuries. Furthermore, Grecinger's attorney questioned Skoglund about why she returned to her relationship with Grecinger after the alleged assault, and why she recanted statements she had made when seeking an order for protection against Grecinger.

Having concluded that expert testimony about battered women syndrome could properly be admitted to rehabilitate Skoglund's credibility under Rule 608(a), we must ascertain whether it is admissible under Minn. R. Evid. 702 when introduced as part of the prosecution's case-in-chief. In *State v. Hennum*, this court considered the admissibility of expert testimony on battered woman syndrome to support a defendant's self-defense claim for the shooting death of her husband. We decided two important issues in *Hennum*. First, we held that battered woman syndrome has gained sufficient scientific ac-

ceptance to warrant admissibility as expert testimony. *Hennum*, 441 N.W.2d at 798–99. We held that such testimony satisfied the helpfulness test of Minn. R. Evid. 702, because it helped to explain a phenomenon that was not understood by the average person. *Id.* at 798. Second, this court held that expert testimony on battered woman syndrome should be limited to a description of the syndrome and its characteristics. *Id.* at 799. We held that the expert should not be permitted to testify on the ultimate fact of whether the particular defendant actually suffers from battered woman syndrome. *Id.*

The question raised by this case is under what circumstances our holding in *Hennum* should be extended to allow for prosecutorial use of expert testimony on battered woman syndrome. Grecinger does not argue that expert testimony on battered woman syndrome should be categorically excluded from the prosecution's case-in-chief against an alleged batterer. Rather, he argues that under Minn. R. Evid. 702, expert testimony on battered woman syndrome should be admissible only to address an issue that is inherently confusing to the jury and only when there is no other evidence to address it.

The decision to admit expert testimony is within the trial court's discretion, and this court will not reverse such a determination absent an apparent error. *See State v. Borchardt*, 478 N.W.2d 757, 760 (Minn.1991). This decision is guided by Rule 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

---

9. During his opening statement, defense counsel depicted Skoglund as a woman who manipulated the situation so as to control Grecinger with the threat of prosecution. Defense counsel stated:
The sheriff then comes out and the sheriff tries to take a statement. And she cuts the deal, I'll tell you what happened, but you don't tell anybody, you don't prosecute, you don't do anything until I say so. She's remaining in control. And she maintains this control, you will learn, right up until April or May of 1994, two and one-half years later. By that time she and Leonard are separated.
Why does she want to remain in control? Well, I think the answer to that is and I think the evidence will show that during the course of her life with Leonard Grecinger after this incident, that she kind of blackmailed him with this, kind of kept him in line. You do what I say or I'm going to go do this or I'm going to go do that.
Record at 47–48.

Minn. R. Evid. 702. The basic consideration in admitting expert testimony under Rule 702 is the helpfulness test—that is, whether the testimony will assist the jury in resolving factual questions presented. *See State v. Myers,* 359 N.W.2d 604, 609 (Minn.1984); *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980). Thus, "[i]f the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience, then the testimony does not meet the helpfulness test." *Helterbridle,* 301 N.W.2d at 547.

In this case, Grecinger contends that the expert testimony did not meet the helpfulness test because it was cumulative of other evidence in the case. He observes that prior to the expert witness' testimony, several other witnesses had testified as to why the prosecution was delayed. For example, Skoglund testified that she did not immediately pursue prosecution because Grecinger forced her to recant her statement to the sheriff's department. Furthermore, a deputy sheriff testified that he did not pursue prosecution at the time of the alleged incident because he had promised Skoglund he would not arrest Grecinger unless she requested that he do so.

However, such testimony does not explain why Skoglund did not seek prosecution at the time of the assault. Instead, the jury might believe that a woman who is beaten by her mate would immediately seek to have him arrested and that such a woman would not recant such a statement despite threats made by the batterer. Consequently, the expert testimony on battered woman syndrome was not duplicative of prior testimony; rather, it

was necessary to explain the complexity of Skoglund's behavior and the reasons for her behavior.

The helpfulness of expert testimony on battered woman syndrome was decided by this court in *Hennum,* where we held that expert testimony on battered woman syndrome would help to explain a phenomenon not within the understanding of an ordinary lay person. *Hennum,* 441 N.W.2d at 798. Thus, it seems clear that the expert's testimony on battered woman syndrome could help the jury understand why Skoglund returned to the relationship with Grecinger after the incident, told contradictory stories about how her injuries were inflicted, waited almost three years to pursue prosecution of Grecinger, and recanted statements she made to the police and the district court regarding Grecinger's abuse. As this court recognized in *Hennum,* the expert testimony on battered woman syndrome would help the jury to understand the behavior of a woman suffering from the syndrome, which might otherwise be interpreted as a lack of credibility. *See id.*

Our decision today is further supported by the Eighth Circuit Court of Appeals' decision in *Arcoren v. United States,* 929 F.2d 1235 (8th Cir.), *cert. denied,* 502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991).[10] In that case, the defendant's wife told a federal grand jury that the defendant had beaten and raped her, but she later recanted that testimony at the defendant's trial. *Id.* at 1237–38. Over the defendant's objections, the district court permitted the prosecution to present expert testimony on battered woman syndrome, and the jury subsequently convicted the defendant. *Id.* at 1238–39.

**10.** Many other states have considered this issue and have held that prosecutorial use of expert testimony on battered woman syndrome is admissible. In most cases, such testimony was permitted in cases in which the victim recanted her earlier allegation of abuse. *See State v. Borrelli,* 227 Conn. 153, 629 A.2d 1105, 1112–15 (1993) (testimony on battered woman syndrome was admissible to explain victim's recantation of her allegation of abuse and her delay in contacting police); *Hawks v. The State,* 223 Ga.App. 890, 479 S.E.2d 186, 189 (1996) (testimony on battered woman syndrome was admissible to explain the victim's contradictory testimony); *State v. Clark,* 83 Haw. 289, 926 P.2d 194, 203–04

(testimony on battered woman syndrome was properly admitted to explain victim's disavowal of her earlier allegation that her husband had stabbed her), *reconsideration denied,* 83 Haw. 545, 928 P.2d 39 (1996); *State v. Searles,* 141 N.H. 224, 680 A.2d 612, 615 (1996) (testimony on battered woman syndrome was admissible to provide a reasonable explanation for the victim's changed testimony); *State v. Bednarz,* 179 Wis.2d 460, 507 N.W.2d 168, 171–72 (Wis.App.1993) (testimony on battered woman syndrome was admissible to give one possible explanation for victim's recantation of statements she made to police), *review denied,* —— Wis.2d ——, 513 N.W.2d 406 (1994).

On appeal, the defendant argued that testimony on battered woman syndrome should be admissible only to support a claim of self-defense. *Id.* at 1241. However, the Eighth Circuit concluded that if the expert testimony satisfies the requirements of Rule 702, it is immaterial whether such testimony is presented by the prosecution or by the defense. *Id.* Reasoning that the expert's testimony helped the jury understand and evaluate the changes in the wife's testimony, the court upheld the admission of the testimony. *Id.*

As noted in *Arcoren,* " '[i]t would seem anomalous to allow a battered woman, where she is a criminal defendant, to offer this type of expert testimony in order to help the jury understand the actions she took, yet deny her that same opportunity when she is the complaining witness and/or victim and her abuser is the criminal defendant.' " *Id.* (quoting *State v. Frost,* 242 N.J.Super. 601, 577 A.2d 1282, 1287, *certification denied,* 127 N.J. 321, 604 A.2d 596 (1990)). Consequently, we hold in the instant case that the prosecutor's use of expert testimony on battered woman syndrome was admissible under Rule 702, because it could help the jury understand behavior that might otherwise undermine the complainant's credibility.

Grecinger also argues that the admission of expert testimony on battered woman syndrome was unfairly prejudicial because such testimony shifted attention away from the case and focused on the problem of domestic violence. Unlike circumstances in which expert testimony on battered woman syndrome is presented to support a defendant's claim of self-defense, prosecutorial use of such testimony raises the added concern for the rights of the alleged batterer in such a proceeding. Because of the special knowledge that expert witnesses possess, we are concerned about the potential for expert testimony on battered woman syndrome to influence a jury unduly, particularly in cases such as this where there are two entirely different accounts of the events in controversy. Thus, to minimize the potential for unfair prejudice to the defendant, we caution trial judges that careful inquiry and balancing must be made under Minn. R. Evid. 403.

■ Under Rule 403, relevant and even helpful expert testimony may be excluded if the probative value of such testimony is substantially outweighed by the danger of unfair prejudice or of misleading the jury. *See, e.g., Borchardt,* 478 N.W.2d at 761–62; *Myers,* 359 N.W.2d at 609–10. Although this court has not previously considered the admissibility of expert testimony on battered woman syndrome under Rule 403, other state courts have addressed this precise issue. *Compare State v. Battista,* 31 Conn.App. 497, 626 A.2d 769, 779–80 (prosecutorial use of testimony on battered woman syndrome was not prejudicial, particularly because of the court's limiting instruction), *cert. denied,* 227 Conn. 907, 632 A.2d 696 (1993), *and State v. Ciskie,* 110 Wash.2d 263, 751 P.2d 1165, 1173–74 (1988) (prosecutorial use of battered woman syndrome testimony was not unfairly prejudicial to defendant, particularly because expert was not permitted to assess the victim's credibility), *with State v. Pargeon,* 64 Ohio App.3d 679, 582 N.E.2d 665, 666–67 (1991) (trial court erred by permitting state to present testimony during its case-in-chief in which expert opined that victim suffered from battered woman syndrome; such testimony created unfairly prejudicial inference of defendant's propensity to batter victim).

We decided in *Hennum* that the theory underlying battered woman syndrome is beyond the experimental stage and has gained substantial acceptance in the scientific community. *Hennum,* 441 N.W.2d at 798–99. When the scientific reliability of expert testimony is not at issue, this court has upheld the presentation of expert testimony by the prosecution to explain complainant's behavior under Rule 403. For instance, this court has held that the prosecution's presentation of expert testimony on the typical reporting practices of adolescent victims of sexual assault was not unfairly prejudicial to a defendant charged with criminal sexual conduct. *See State v. Hall,* 406 N.W.2d 503, 505 (Minn. 1987).

■■ Thus, a defendant need not be unfairly prejudiced by the prosecution's use of expert testimony on battered woman syndrome, if adequate limitations are placed on the presentation thereof. In *Hennum,* this

court held that an expert testifying on battered woman syndrome may not testify as to whether the defendant actually suffers from the syndrome. *Hennum*, 441 N.W.2d at 799. This holding similarly applies to expert testimony on battered woman syndrome presented by the prosecution. Such a limitation provides one means of ensuring that such testimony will not unfairly prejudice the alleged batterer.

▪ In addition, because of our concern about the impact expert testimony on battered woman syndrome may have on the jury, we emphasize that the expert may not suggest that the complainant was battered, was truthful, or fit the battered woman syndrome. Likewise, the expert may not express an opinion as to whether the defendant was in fact a batterer.

In the case at hand, the expert testimony was adequately limited and was not unfairly prejudicial to Grecinger. Earlier in the trial, the testimony of a psychologist who had treated Skoglund laid the foundation for the expert testimony on battered woman syndrome. The psychologist merely testified to characteristics possessed by Skoglund which were consistent with those found in someone suffering from battered woman syndrome.[11] Although the psychologist testified that she diagnosed Skoglund with posttraumatic stress disorder, she did not give testimony on the ultimate fact of whether Skoglund suffered from battered woman syndrome. Similarly, when the expert witness took the stand, her testimony was limited to a definition of battered woman syndrome, an explanation of the general symptoms of posttraumatic stress disorder

as exhibited by battered women, and a description of common characteristics shared by battered women. The expert did not testify as to whether Skoglund suffered from battered woman syndrome, whether or when Skoglund had told the truth, or whether Grecinger was a batterer. Consequently, the issue of Skoglund's credibility remained in the hands of the jury, and Grecinger was not unfairly prejudiced.

In summary, we hold that expert testimony on battered woman syndrome presented during the prosecution's case-in-chief is admissible if it is introduced after the victim's credibility has been attacked by the defense, *see* Minn. R. Evid. 608(a), if it helps the jury understand the victim's inconsistent statements or delay in seeking prosecution of the batterer, *see* Minn. R. Evid. 702, and if the expert merely describes the syndrome and its characteristics and does not offer an opinion as to whether the victim suffers from it, thereby reducing the risk of unfair prejudice to the defendant, *see* Minn. R. Evid. 403.

Affirmed.

### SPECIAL CONCURRENCE

Stringer, Justice (concurring specially).

While I agree with the majority that admitting expert testimony regarding battered woman syndrome was within the broad discretion the trial court exercises over admissibility of evidence, and therefore concur in affirming the conviction, I write separately to express a concern regarding the potential impact of this kind of evidence on the jury, and what the trial court should do to minimize the potential for unfair prejudice to the defendant.[1]

---

11. In *Hennum*, this court held that each party may present witnesses to "testify to characteristics possessed by the defendant which are consistent with those found in someone suffering from battered woman syndrome." *Hennum*, 441 N.W.2d at 799.

1. Several commentators have expressed concerns about the prejudicial effect and potential misuse by the jury of "social framework evidence" such as expert testimony on battered woman syndrome. *See, e.g.,* Cathleen C. Herasimchuk, *A Practical Guide to the Admissibility of Novel Expert Evidence in Criminal Trials Under Federal Rule 702*, 22 St. Mary's L.J. 181, 246–47 (1990) ("Expert testimony relating to a scientific

field which is only in an emerging, experimental stage, might pose a greater potential for affecting a jury in an emotional sense if the jury is likely to conclude incorrectly that the scientific expertise is infallible."); Myrna S. Raeder, *The Double-Edged Sword: Admissibility of Battered Woman Syndrome by and Against Batterers in Cases Implicating Domestic Violence*, 67 U. Colo. L.Rev. 789, 791 (1996) ("It is undeniable that any type of social science evidence presented by prosecutors is not only highly prejudicial but also may not survive a challenge based on its being evidence of group character."); Neil J. Vidmar & Regina A. Schuller, *Juries and Expert Evidence: Social Framework Testimony*, Law & Contemp.

It is our tradition of justice that we look to the jury to apply its experience and common sense in the search for truth, and we are loath to allow testimony that in any way interferes with its responsibility to resolve these "ultimate issues." *See* 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 351, at 636 (2d ed.1994). To deal with this concern, this court has adopted the Rules of Evidence, and particularly Rule 403, implementing a balancing test weighing the probative value of relevant evidence against the danger of unfair prejudice and other concerns. Evidence may be excluded, although relevant, if the harmful effect substantially outweighs the probative value. Minn. R. Evid. 403. The trial courts properly are entrusted with wide discretion in applying this test. Thus, in *State v. Hennum,* we held that evidence of battered woman syndrome was properly admitted where offered by the *defendant* as a shield to help the jury understand the admitted killing of her husband in the context of a long-term abusive relationship. 441 N.W.2d 793, 798 (Minn.1989). We further held that the expert's testimony was limited to a description of the general nature of battered woman syndrome: "The expert should not be allowed to testify as to the ultimate fact that the particular defendant actually suffers from battered woman syndrome." *Id.* at 799.

Here, however, the situation is quite different, as in these circumstances evidence of the syndrome is offered by the *state* as a prosecutorial sword, and the risk of unduly prejudicing the defendant's right to a presumption of innocence and a fair trial is well-illustrated. The complainant, who was in an intimate relationship with the defendant, alleged that the defendant repeatedly and regularly battered her during the course of the relationship; the defendant denied the battering, giving an entirely different account of the events in controversy. Thus, the jury was faced with the question of whom to believe. Defendant challenged the complainant's credibility by cross-examining her as to why, if she were so regularly and frequently battered, she continued in her relationship with the defendant, and why for three years she did not complain to law enforcement authorities; further, when she did complain, why she later withdrew her complaint. To rehabilitate the complainant, expert testimony on battered woman syndrome was offered by the prosecution and admitted in evidence to explain how fear, intimidation, and helplessness tend to keep a woman in an abusive relationship.

The admission of the expert testimony on battered woman syndrome could have a profound influence on the jury in its determination as to whom to believe on the basic issue of whether the battering occurred at all—even though the court prohibited the expert witness from testifying as to whether the complainant was in fact a battered woman. The right to a presumption of innocence would soon be an empty epithet unless the trial court exercises extraordinary vigilance in applying Rule 403 under circumstances such as we have here, where guilt or innocence turns solely on which of two accounts to believe, and expert testimony, that arguably implies that the criminal conduct charged actually did occur, is offered to explain inconsistent conduct by the complainant. Careful inquiry must be made under Rule 403 as to all aspects of the need for, and value of, the expert testimony as rehabilitative of the witness' credibility and its helpfulness to the jury, and these factors must be balanced against the clear potential for unfair prejudice to the defendant.

I agree with the majority that because of the potential for severe prejudice, in addition to prohibiting the witness from testifying as

---

Probs., Autumn 1989, at 133, 143 ("Social framework evidence is intended to be used for a limited purpose, namely to provide a context for evaluating the testimony of a witness. It should not be used to assess witness credibility, which is solely the task of the jury."); Joan M. Schroeder, Note, *Using Battered Woman Syndrome Evidence in the Prosecution of a Batterer,* 76 Iowa L.Rev. 553, 577 (1991) ("[W]hen an expert states that the victim suffers from [battered woman] syndrome, there is a danger of impermissible prejudice and the defendant's right to a fair trial is seriously jeopardized."); Annie E. Thar, Comment, *The Admissibility of Expert Testimony on Battered Wife Syndrome: An Evidentiary Analysis,* 77 Nw. U.L.Rev. 348, 371 (1982) ("[An] important safeguard against the improper use of battered wife syndrome testimony is the judge's ultimate power to decide whether or not to admit the evidence.").

to whether the complainant in fact suffered from battered woman syndrome, the trial court should not admit testimony that would suggest that the complainant was battered or fit the battered woman profile, that the complainant was truthful, or that the defendant was a batterer. Further, I would impose the additional restriction that, in circumstances where the evidence is used offensively as here, the trial court should prohibit any expert who has examined the complainant from testifying as to the general nature of battered woman syndrome in order to assure that no prejudicial inferences can be drawn that the complainant was in fact battered or suffered from battered woman syndrome. These restrictions have been endorsed by other courts, *see* 3 Mueller & Kirkpatrick, *supra*, at 639, and will protect against the jury perceiving the expert testimony as evidence on the ultimate issue of guilt or innocence.