**STATE of Minnesota, Respondent,**

v.

**Elton Perez VANCE, Appellant.**

**No. A03–1632.**

Court of Appeals of Minnesota.

Aug. 31, 2004.

Mike Hatch, Attorney General, St. Paul, MN, and James C. Backstrom, Dakota County Attorney, Helen R. Brosnahan, Assistant County Attorney, Dakota County Judicial Center, Hastings, MN, for respondent.

John M. Stuart, State Public Defender, Bridget Kearns, Assistant Public Defender, Minneapolis, MN, for appellant.

Considered and decided by HARTEN, Presiding Judge; KALITOWSKI, Judge; and ANDERSON, Judge.

## OPINION

KALITOWSKI, Judge.

Appellant challenges his convictions of second-degree assault, third-degree criminal sexual conduct, and three counts of first-degree criminal sexual conduct. Appellant contends that the district court erred in admitting expert testimony on battered-woman syndrome and in imposing an upward sentencing departure.

## FACTS

Appellant Elton Perez Vance and the victim, A.S.T., began an on-and-off relationship in 1996; and appellant is the father of the victim's children. On the afternoon of February 2, 2003, the victim called 911 and reported that appellant had been beating her all day at her apartment. At trial, the 911 dispatcher testified, and a tape of the call was played for the jury. Crying and upset, the victim told the dispatcher that she had recently escaped to a neighbor's apartment with one of her children and that appellant was still in her apartment either sleeping or passed out from alcohol with one of her other children. Although the victim denied that appellant had threatened her with any weapon, she told the dispatcher that appellant had cut her hair again and had beaten her with his fists.

Three Eagan police officers responded to the 911 call and testified at trial. While one officer secured appellant's location, two officers spoke with the victim. The officers testified that the victim was crying and very upset. They also testified that the victim was severely beaten around the face and that her injuries included swollen lips, black-and-blue eyes, facial swelling, and marks, bruises, and abrasions around her neck. The victim also had several cigarette burns on her body, and her shirt and body were wet with urine. The police took photographs of the victim and her injuries.

The victim told the police officers that appellant was still in her apartment and gave them permission to enter her apartment and remove appellant. Upon entering the victim's apartment, officers discovered appellant asleep on a mattress with a child lying near him. The police officers arrested appellant. The police informed appellant that he was being taken into custody because they believed he had committed third-degree assault against the victim and explained that it was third-degree assault because the victim had been burned. According to the police, appellant stated, "Now you're going to tell me that I burned my baby's mommy with cigarettes, too." But the police had never told appellant what had caused the victim's burns. Appellant repeatedly stated, "I didn't do sh-t" and inquired whether the victim was pressing charges. The police told appellant that in domestic assault situations, the police press charges to relieve the victim from the burden. Appellant replied that the victim had done this before, she would not show up to court, and he would "beat this thing."

While the police officers were arresting appellant, a paramedic talked with the victim. The paramedic testified that the victim was crying, very upset, disheveled, and bleeding. The paramedic also testified that the victim had multiple abrasions down her neck; swollen lips; severe facial swelling; bruising all over her body including on her neck, chest, side, and back; cigarette burns all over her body; and a

large part of her hair had been cut off. The victim told the paramedic that appellant had repeatedly forced her to have oral and vaginal sex with him, burned her with a cigarette, cut her hair, choked and strangled her, punched and kicked her, and urinated on her. The victim stated she had resisted the first few times appellant had sexually assaulted her, but she stopped resisting when appellant beat her even more severely.

After arresting appellant, one of the police officers spoke with the victim. In addition to reiterating earlier statements she had made to the police, the victim told the officer that appellant had cut off clumps of her hair with a kitchen knife, repeatedly forced her to have oral and vaginal sex, and repeatedly burned her with a cigarette.

The police officers searched the victim's apartment for evidence and photographed and collected a steak knife, a cigarette butt found near the mattress where appellant had been sleeping prior to his arrest, clumps of the victim's hair, and two or three of the victim's T-shirts that were covered with blood and urine.

The victim was transported to a local hospital where a nurse with the Sexual Assault Forensic Examination (SAFE) program examined and treated her. The victim told the nurse that appellant had beaten her and repeatedly forced her to have oral and vaginal sex with him. The nurse observed and noted the victim's numerous visible injuries and testified that the results and findings of her examination were consistent with the victim's report of sexual assault. The police again interviewed the victim at the hospital, and she repeated much of what she had already told the police, the paramedic, and the nurse.

The following day, the police again interviewed the victim and noted her numerous injuries. Consistent with what she had already told the police, the paramedic, and the nurse, the victim relayed the events of the previous day. Specifically, the victim explained that appellant was the father of her children, that she and appellant had been romantically involved, that they had broken up, but they were trying to work things out. The victim explained that appellant had begun drinking on the night of February 1 and then proceeded to beat her by punching and choking her. The victim further explained that appellant forced her to perform oral sex on him four or five times and forced her to have vaginal intercourse four or five times. The victim stated that these assaults took place in the living room until the children woke up and then they occurred in a back bedroom. The victim further stated that appellant burned her with a cigarette numerous times, cut her hair with a knife, urinated on her, refused to allow her to get dressed, and refused to allow her to use the bathroom.

Appellant was charged with second-degree assault, third-degree criminal sexual conduct, and three counts of first-degree criminal sexual conduct. At appellant's first court appearance, the district court ordered appellant to abstain from all contact with the victim. But prior to trial, there was evidence that appellant was violating the court's no-contact order by calling the victim from jail. The district court subsequently revoked appellant's phone privileges. But the following day, appellant's fellow inmate called the victim and warned her to "lay low." The district court then ordered appellant to be held in segregation. Prior to trial, it became evident that the victim was no longer willing to cooperate in the prosecution of appellant, and a subpoena was served on her to compel her testimony at appellant's trial. When the victim failed to appear on the

subpoena, she was arrested and held as a necessary witness.

At trial, the victim's testimony about the incident differed substantially from what she had recounted to the police, the paramedic, and the nurse. The victim admitted that she and appellant had fought on the day in question, but testified that she could not remember the details of the fight, how she received her injuries, what occurred at the hospital, or what she told law enforcement officials. The victim also testified that she and appellant had consensual sexual relations on a daily basis in January and February 2003. She specifically testified that she and appellant had sex on February 2, 2003, and that the sex was consensual. But the victim also testified that she could not remember having consensual sex with appellant on February 2 between 5 a.m. and 3 p.m. The victim further testified that neither reviewing the statements she made to law enforcement officials nor reviewing the photographs of herself taken on the day of the incident would refresh her memory, and the state did not attempt to directly impeach the victim with her earlier statements.

The victim admitted that she did not want to testify, that she was being held in custody to ensure that she testified, and that she still loved appellant and wanted to work things out with him. The victim also admitted that she had talked to appellant on the phone many times between the time he was arrested and the time of the trial and that she sent him numerous letters and money for telephone calls and personal items. The victim further admitted that appellant had attempted to persuade her to contact the prosecutor or court and recant, although she testified that it was also her choice to contact the prosecutor and court. But the victim also admitted that appellant demanded that she send him letters and money. And at trial, the state presented evidence that appellant had called more than 100 times from jail, and the jury heard several of those conversations on audiotape. During the taped telephone conversations, appellant demanded that the victim call law enforcement officials and change her earlier statements to the police.

After hearing testimony from all of the state's witnesses, the district court granted the state's motion to present expert testimony on battered-woman syndrome. The district court reasoned that many people did not understand battered-woman syndrome, that the victim's "behavior might be very difficult for a jury to understand," and that one of the purposes of expert testimony is to help the jury understand things that are not common knowledge. Prior to the expert's testimony, the court instructed the jury that it was going to hear testimony on battered-woman syndrome, that the testimony was being received for the limited purpose of allowing them to hear evidence on the syndrome, that admission of the testimony did not mean that the victim actually suffered from the syndrome or that the syndrome even existed, and that those were fact questions for the jury to decide.

The witness, a clinical psychologist and expert on battered-woman syndrome, testified about the common characteristics of the syndrome, including terror, acceptance of blame for the abuse, minimization or denial of the abuse, depression, isolation, avoidance of reporting the abuse, recantation of the original report of abuse, fear of retaliation, and loss of self-worth. The expert also described the reasons a battered person may stay in a violent relationship and the impact of the presence of children and how that plays a role in the dynamics of an abusive relationship. The expert further explained that sexual violence is very common in an abusive domes-

tic relationship and testified regarding many of the common misperceptions about abusive domestic relationships.

The jury found appellant guilty on all five counts. And the district court sentenced appellant to 288 months, a double upward departure, for the first-degree criminal sexual conduct conviction and a concurrent 21–month sentence for the assault conviction.

## ISSUES

1. Did the district court err in allowing the state to present expert testimony on battered-woman syndrome?

2. Did the district court err in imposing an upward durational departure at sentencing?

## ANALYSIS

### I.

Appellant first argues that the district court erred in admitting the expert witness's testimony on battered-woman syndrome. We disagree. The admission of expert testimony is within the broad discretion accorded a district court and this court will not reverse absent a clear abuse of discretion. *State v. Ritt*, 599 N.W.2d 802, 810 (Minn.1999). When considering whether to admit expert testimony, the district court must determine whether the testimony will assist the jury in resolving factual questions presented at trial. Minn. R. Evid. 702. But when deciding whether to admit expert testimony, the district court must also balance the relevance of the testimony against the danger of creating unfair prejudice, the potential for confusing or misleading the jury, and other concerns. Minn. R. Evid. 403.

The Minnesota Supreme Court first addressed whether and to what extent the prosecution could present expert testimony on battered-woman syndrome in

*State v. Grecinger*, 569 N.W.2d 189 (Minn. 1997). *Compare State v. Hennum*, 441 N.W.2d 793, 798 (Minn.1989) (addressing under what circumstances a criminal defendant can present expert testimony on the syndrome in support of a self-defense theory). In *Grecinger*, the court stated that the prosecution's use of expert testimony on battered-woman syndrome is admissible under Minn. R. Evid. 702 if it helps the jury understand behavior that might otherwise undermine the victim's credibility. 569 N.W.2d at 196. But to ensure that a defendant is not unfairly prejudiced, an expert may not testify as to whether a complainant or witness actually suffers from the syndrome, suggest that the complainant was battered, was truthful, or fit the battered-woman syndrome, or express an opinion as to whether the defendant is a batterer. *Id.* at 196–97.

Appellant first argues that the district court erred in admitting the expert testimony on battered-woman syndrome because neither he nor the state attacked the victim's credibility. But at trial, appellant did not object to admission of the expert testimony on this ground. Instead, appellant initially argued that the district court should exclude the expert testimony because it was not necessary if the victim testified consistent with the police reports and the criminal complaint. And subsequently, when the district court was considering whether to admit the testimony after all of the state's other witnesses had testified, appellant argued that the testimony was unnecessary because the jury was capable of interpreting the evidence and drawing its own conclusions. Thus, appellant may have waived the argument he is raising on appeal. But even if appellant did not waive this argument, we conclude that the district court did not err in admitting the expert testimony on battered-woman syndrome.

Appellant contends that under *Grecinger* and Minn. R. Evid. 608(a), the prosecution may only present expert testimony on battered-woman syndrome in its case-in-chief if the defendant first attacks the complainant's credibility. We disagree.

In *Grecinger*, the victim testified at trial that the defendant, her former boyfriend, had assaulted and attempted to kill her approximately three years earlier. 569 N.W.2d at 190–92. The defense attacked the victim's credibility in its opening statement and during its cross-examination of the victim. *Id.* at 192–93. In turn, the district court allowed the prosecution to present in its case-in-chief expert testimony on battered-woman syndrome to explain why the victim had waited nearly three years after the appellant had assaulted her to pursue prosecution, returned to the relationship with the appellant after the assault, told contradictory stories about how her injuries were inflicted, and recanted statements she made after the assault. *Id.* at 193. Essentially, the prosecution presented the expert testimony to bolster the victim's credibility at trial. The *Grecinger* court concluded that the district court properly admitted battered-woman syndrome testimony during the prosecution's case-in-chief because by the time it was presented, the victim's credibility "was already at issue." *Id.* at 194.

■ Similarly, we conclude that here the district court properly admitted expert testimony on battered-woman syndrome during the prosecution's case-in-chief because by the time it was presented, the victim's credibility was already at issue. At trial, the jury heard the testimony of the three police officers who had responded to the 911 call, the paramedic who had talked with the victim after the incident, and the nurse who examined the victim at the hospital. These witnesses described the victim's injuries following the incident, including multiple abrasions and bruises on her face, neck, chest, sides, and back; swollen lips; severe facial swelling; numerous cigarette burns all over her body; and a large chunk of her hair missing. And photographs taken by the police and admitted into evidence show these injuries. The witnesses also testified how the victim had told them that appellant had repeatedly punched and kicked her, burned her with a cigarette, choked and strangled her, urinated on her, cut her hair with a kitchen knife, and repeatedly forced her to have oral and vaginal sex with him. Moreover, the nurse testified that the results and findings of her examination were consistent with the victim's report of sexual assault.

At trial the victim recanted her earlier account of the incident. Although the victim admitted that she and appellant had fought on the day in question, she testified that appellant did not force her to have oral or vaginal sex with him and all sex between them was consensual. She also testified that she could not remember the details of the fight, how she received her injuries, what occurred at the hospital, or what she told law enforcement officials. The prosecution did not impeach the victim with her earlier statements to the police and health professionals. Nor did the defense attempt to impeach the victim, which is not surprising given that the victim's testimony was largely favorable to appellant. But even though neither the prosecution nor the defense attempted to directly impeach the victim, we conclude that the victim's credibility was at issue by the time the prosecution presented the battered-woman syndrome testimony. And therefore, we conclude that the district court properly admitted this testimony during the prosecution's case-in-chief.

In support of his argument that expert testimony on battered-woman syndrome is only admissible if the defense first attacks the victim's credibility, appellant quotes *Grecinger's* statement that this evidence is admissible "if it is introduced after the victim's credibility has been attacked by the defense." 569 N.W.2d at 197. But we conclude that this language is dicta that the supreme court included based on the specific circumstances of that case. Unlike *Grecinger*, where the victim provided the strongest testimony indicating the defendant's guilt, here there was no need for the defense to attack the victim's credibility. At trial the victim recanted her story and gave testimony that largely exculpated appellant, particularly on the most serious criminal sexual conduct offenses. On these facts, the district court properly admitted expert testimony on battered-woman syndrome to explain why the victim had recanted her story.

Our decision is supported by this court's recent decision in *State v. Plantin*, 682 N.W.2d 653, 662 (Minn.App.2004), *pet. for review filed* (Minn. Aug. 11, 2004), where we held that the district court did not abuse its discretion in admitting battered-woman syndrome testimony where the prosecution offered the testimony to explain why the victim recanted her story at trial and gave testimony that tended to exculpate the defendant.

◼ Our decision is also consistent with *Grecinger*, 569 N.W.2d at 195, and the Eighth Circuit Court of Appeals. *See Arcoren v. United States*, 929 F.2d 1235 (8th Cir.), *cert. denied*, 502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991). In *Arcoren*, the defendant's wife told a federal grand jury that the defendant had beaten and raped her, but she later recanted at the defendant's trial. *Id.* at 1237–38. Over the defendant's objections, the district court permitted the prosecution to present expert testimony on battered-woman syndrome, and the jury subsequently convicted the defendant. *Id.* at 1238–39. And in a footnote citing many foreign cases, *Grecinger* notes that many other states had determined that expert testimony on battered-woman syndrome was admissible, and in most cases, "such testimony was permitted in cases in which the victim recanted her earlier allegation of abuse." 569 N.W.2d at 195 n. 10. Therefore, substantial caselaw supports our conclusion that where the alleged victim's testimony is at issue, the district court may admit testimony on battered-woman syndrome, during the prosecution's case-in-chief, even if neither party directly attacks the victim's credibility.

## II.

◼ Appellant also challenges the district court's imposition of an upward durational departure. Here, the district court sentenced appellant to 288 months for the first-degree criminal sexual conduct conviction, which was a double upward departure, and a concurrent 21–month sentence for the second-degree assault. In support of the upward departure, the district court found that appellant: (1) held the victim captive for a significant period of time; (2) treated the victim with particular cruelty by inflicting multiple painful cigarette burns all over her body, repeatedly beating her, cutting her hair, and urinating on her face and upper body; (3) penetrated the victim in several ways; (4) committed the offenses in the victim's home and thereby stayed beyond his invitation and violated and exploited the victim's trust in him; and (5) committed the offenses in the presence of children.

After this appeal was briefed, the United States Supreme Court issued its opinion in *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, —— L.Ed.2d ——

(2004), holding that an upward departure under the State of Washington's determinate sentencing scheme violated the defendant's Sixth Amendment right to a jury trial. Appellant has cited *Blakely* in a letter to this court, but the application of that opinion has not been briefed. *See* Minn. R. Civ.App. P. 128.05 (allowing citation of supplemental legal authority without argument). Appellant did not request supplemental briefing, and we conclude that the interests of justice do not warrant addressing *Blakely* for the first time on appeal without any briefing on the issue. *See generally State v. Sorenson,* 441 N.W.2d 455, 457 (Minn.1989) (declining to address constitutional issue not fully briefed and not litigated in district court). Accordingly, we remand to the district court for a consideration of the application, if any, of *Blakely* to appellant's sentence.

## DECISION

Because the victim recanted her earlier allegations against appellant, the victim's credibility was at issue. The district court did not abuse its discretion in allowing expert testimony regarding battered-woman syndrome during the prosecution's case-in-chief, even though neither party had directly impeached the victim's trial testimony. Therefore, we affirm the district court's admission of the evidence but remand the issue of the upward sentencing departure to the district court for consideration of the application of *Blakely*, if any, to appellant's sentence.

**Affirmed in part and remanded in part.**